75 P.3d 675

**STATE of Arizona, Appellee,**

v.

**Kajornsak PRASERTPHONG, Appellant.**

No. CR–01–0100–AP.

Supreme Court of Arizona,
En Banc.

Sept. 2, 2003.

Janet A. Napolitano, Former Attorney General, Terry Goddard, Attorney General by Kent E. Cattani, Chief Counsel, Capital Litigation Section, Phoenix, and Monica B. Klapper, Assistant Attorney General, Bruce M. Ferg, Assistant Attorney General, Tucson, Attorneys for Appellee.

Susan A. Kettlewell, Pima County Public Defender by Rebecca A. McLean, Assistant Public Defender, Lori J. Lefferts, Assistant Public Defender, Tucson, Attorneys for Appellant.

**OPINION**

RYAN, Justice.

¶ 1 A Grand Jury indicted Kajornsak Prasertphong and Christopher "Bo" Huerstel charging them with three counts of first degree murder and three counts of armed robbery for events that occurred at a Pizza Hut restaurant in Tucson. The trial jury convicted Prasertphong of three counts of first degree felony murder and three counts of armed robbery. Following a mitigation and aggravation hearing, the trial judge sen-

tenced him to death for the murders of Melissa Moniz and James Bloxham, and to life imprisonment without the possibility of release for the death of Robert Curry. Prasertphong also received three concurrent prison terms of twenty-one years for the three armed robbery convictions. Appeal is automatic when the trial court imposes a sentence of death. Ariz. R.Crim. P. 26.15 and 31.2(b). We have jurisdiction under Article 6, Section 5.3 of the Arizona Constitution and Arizona Revised Statutes ("A.R.S.") section 13–4031 (2001).

**I.**

¶ 2 On January 17, 1999, Moniz, Bloxham, and Curry were working the dinner shift at the Pizza Hut.[1] At approximately 11:00 p.m., Michael Orban arrived at the Pizza Hut to pick up Moniz. He found her lying at her waitress station, still alive and spitting out blood. Orban "freaked out." As he turned to run to a Circle K to call 911, he saw Curry and Bloxham, both dead, lying in a pool of blood near the counter by the cash register.

¶ 3 Shortly after Orban's call to 911, an ambulance arrived at the Pizza Hut and took Moniz to the hospital. She died at the hospital one to two hours later of gunshot wounds to the head, neck, and right arm and hand. Curry died of gunshot wounds to the head, neck, and chest. He likely bled to death within five to twenty minutes. When he died, he had 358 dollars in his pockets. Bloxham died of gunshot wounds to the head, chest, abdomen, and left leg. Bullets passed through his lungs as well as the middle of his brain, and he likely died immediately or within three to four minutes.

¶ 4 By the time Tucson Police Department detectives arrived at the Pizza Hut, Moniz had already been removed from the crime scene. During the course of their investigation, the detectives noticed one booth in the restaurant on which silverware, plates, and napkins remained. Later testing of those

---

1. We view the evidence presented at trial in a light most favorable to sustaining the verdicts. *State v. Gallegos*, 178 Ariz. 1, 9, 870 P.2d 1097, 1105 (1994) (citing *State v. Atwood*, 171 Ariz. 576, 596, 832 P.2d 593, 613 (1992), disapproved on other grounds by *State v. Nordstrom*, 200 Ariz. 229, 241, ¶ 25, 25 P.3d 717, 729 (2001)).

items revealed DNA evidence from both Prasertphong and Huerstel.

¶ 5 The detectives found bullets, bullet fragments, and shell casings throughout the restaurant, near the victims, in the wait station, on top of the cash register, and lodged in a gumball machine. One shell casing was found near the east entrance of the Pizza Hut, outside of the wait station. Criminalist Lucien Haag testified that from the placement of that shell casing it was likely that the round was fired near the restrooms, and that the bullet traveled through the wall of the wait station, past the area in front of the cash registers, and into the gumball machine, located near the west entrance. Small pieces of Formica or particle board that made up the wall were scattered on the floor outside of the wait station. Based on the location of those pieces, a detective determined that the bullet came from the area by the restrooms and traveled across the restaurant toward the front door.

¶ 6 The morning after the murders, the Tucson Police Department received a telephone call from Josh Simmons. Simmons told police that earlier that morning, Huerstel admitted to Simmons that he and Prasertphong were involved in the Pizza Hut murders. According to Simmons, Huerstel stated that he and Prasertphong originally had gone to the Pizza Hut to rob the restaurant. Huerstel also told Simmons that he shot Moniz first in the neck, then "continued to the back." When he came from the back, Huerstel claimed that Prasertphong was trying to break Moniz's neck. Simmons told police that Huerstel did not relate any details about the killings of Bloxham or Curry. Simmons then told police where they could find Prasertphong and Huerstel. Based on Simmons' tip, the police located and arrested Prasertphong and Huerstel. They were standing next to Prasertphong's truck when arrested.

¶ 7 Once in custody, Detectives Olivas and Charlton questioned Prasertphong and Huerstel. The interviews were audio taped. Huerstel was questioned first but denied any involvement in the murders and denied having eaten at the Pizza Hut.

¶ 8 Before questioning Prasertphong, Detective Olivas determined that Prasertphong was a native of Thailand and confirmed that he understood English. He was read his *Miranda*[2] rights, and he agreed to answer questions.

¶ 9 Prasertphong told detectives that on the evening of January 17, 1999, he and Huerstel ate at the Pizza Hut. Prasertphong drove the pair to the restaurant in his 1995 Nissan pickup truck. Prasertphong normally kept his Glock 22 .40 caliber gun in the truck. While eating, the pair discussed robbing the Pizza Hut. It was during this discussion that Prasertphong claimed to have learned that Huerstel brought Prasertphong's gun into the restaurant. But, according to Prasertphong, he decided not to rob the restaurant because there was a female present and because he had his debit card with him.

¶ 10 After they ate, Prasertphong said he went to the cash register to pay the bill with his debit card while Huerstel went to the restroom. Prasertphong claimed that as the debit card machine was printing the receipt, Huerstel came out of the bathroom "going crazy" with Prasertphong's gun. The first shot hit Moniz. Curry asked Huerstel, "What do you want, what do you want, what do you want?" Huerstel replied, "Where's the safe?" He then shot Curry. Curry dropped a bank bag as he fell to the ground. As Bloxham started to run toward the back, Huerstel "took him out too."

¶ 11 Meanwhile, Moniz began to crawl up on her knees. Prasertphong wanted to make sure she was dead, so he "grabbed her by the hair and looked at her. And she was still breathing." He tried to snap her neck but was unsuccessful, so Huerstel shot her in the head. On the way out of the restaurant, Prasertphong took the debit card machine as well as the bank bag that Curry had dropped. The bank bag contained only checks. The cash register was left untouched and there was no evidence that Prasertphong or Huerstel took anything from the safe.

---

**2.** *Miranda v. Arizona,* 384 U.S. 436, 444–45, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

¶ 12 Prasertphong also told the detectives that after committing the crimes, he and Huerstel fled the Pizza Hut in Prasertphong's truck. They threw the debit card machine into a wash and burned the bank bag. Prasertphong put the murder weapon, the weapon's magazine, a pair of gloves, and several pieces of identification into a plastic bag and hid it inside the wheel well of the spare tire underneath the truck. Prasertphong and Huerstel then went to Aaron's Billiards. While there, Prasertphong called in a false police report to the Tucson Police Department claiming that his truck had been broken into and that his wallet, identification cards, and other items were missing.

¶ 13 After filing the false police report, Prasertphong and Huerstel left Aaron's Billiards and went to a friend's house to spend the night. Adam Wilkey and Josh Simmons were asleep at the house when Prasertphong and Huerstel arrived. At the end of the interview, Prasertphong told the detectives where to find his gun and the burned bank bag and led them to the debit card machine.

¶ 14 After interviewing Prasertphong, detectives played a portion of that interview for Huerstel. Upon hearing Prasertphong admit to some involvement in the murders, Huerstel admitted he also had been involved and that he shot the three victims.

¶ 15 The trial court granted a motion to sever Prasertphong's and Huerstel's trials, but over objection, conducted the trials simultaneously before dual juries. Because of pretrial publicity, the case was tried in Prescott.

## II.

¶ 16 Prasertphong first argues that he was denied a fair trial because the trial court admitted, over his objection, evidence obtained during a warrantless search of his truck.

¶ 17 After Prasertphong and Huerstel were arrested, Detective Wright had Prasertphong's truck towed to the police station in Tucson because she felt that it was not secure on the street because of an unlockable rear window. Once at the station, Detective Wright still did not believe that the truck was secure, claiming that the police garage is "a major thoroughfare going into the police station" and could be accessed by anyone in the station. She therefore conducted a warrantless search of the vehicle specifically looking for a weapon. She searched the cab of the truck, the engine compartment, and under the vinyl cover over the bed of the truck but did not find a weapon.

¶ 18 After Prasertphong told Detectives Olivas and Charlton where the gun was located, Detective Wright was directed to conduct a second warrantless search, specifically looking in the wheel well of the spare tire underneath the truck. The second search produced a clear plastic baggie containing a holster, a Glock 22 .40 caliber gun, a loose bullet, ammunition, a gun magazine, a pair of gloves, and Prasertphong's identification cards.

¶ 19 Two days later, the police obtained a telephonic search warrant for a third search of the vehicle, as well as for luminol testing, which can disclose the presence of blood stains. The testing produced no blood traces in the vehicle.

¶ 20 Before trial, Prasertphong filed a motion to suppress the fruits of the warrantless searches of his truck. The court agreed that the first warrantless search was "unreasonable and in violation of the [Fourth] Amendment and Article 2, Section 8 of the Arizona Constitution." However, because no evidence was obtained during that search, there was nothing to suppress. The trial court ruled that the second warrantless search was valid because 1) Prasertphong waived his privacy rights by admitting the location of the gun and 2) under the doctrine of inevitable discovery, the gun would have been discovered.

¶ 21 We "give deference to the trial court's factual findings, ... but we review *de novo* the trial court's ultimate legal determination" as to whether the Fourth Amendment was violated. *State v. Gonzalez-Gutierrez*, 187 Ariz. 116, 118, 927 P.2d 776, 778 (1996); *see also State v. Sanchez*, 200 Ariz. 163, 165, ¶ 5, 24 P.3d 610, 612 (App.2001).

¶ 22 The Fourth Amendment to the United States Constitution guarantees "[t]he

right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A search can be conducted only after a warrant has been issued by a neutral magistrate upon a showing of probable cause. *Illinois v. McArthur,* 531 U.S. 326, 330, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001). A warrantless search is per se illegal unless justified under one of the few "jealously and carefully drawn" exceptions to the warrant requirement. *Jones v. United States,* 357 U.S. 493, 499, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958). Generally, probable cause, without more, is insufficient to justify a warrantless search. *Id.* at 497, 78 S.Ct. 1253.

¶ 23 The trial court denied Prasertphong's motion to suppress based on the inevitable discovery doctrine. *See Nix v. Williams,* 467 U.S. 431, 443–44, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). Under that doctrine, illegally obtained evidence is admissible if the government can show by a preponderance of the evidence that the evidence would inevitably have been discovered through lawful means. *Id.* at 444, 104 S.Ct. 2501. Lawful means includes discovery "by following routine procedures." *United States v. Ramirez–Sandoval,* 872 F.2d 1392, 1399 (9th Cir.1989).

¶ 24 Prasertphong challenges the trial court's conclusion that the evidence was admissible under the inevitable discovery doctrine. He argues that the State's mere assertion that "on-going police procedures certainly would have eventuated in the gun being found" does not make it so. The State argues, as it did at trial, that even if the inevitable discovery doctrine is inapplicable, the evidence was admissible under the automobile exception to the warrant requirement. We agree. We can affirm a trial court's ruling on a motion to suppress if the court reached the correct result even though based on incorrect reasoning. *State v. Sardo,* 112 Ariz. 509, 515, 543 P.2d 1138, 1144 (1975) (citing *State v. Martin,* 102 Ariz. 142, 146, 426 P.2d 639, 643 (1967)).

¶ 25 Under the automobile exception, "[i]f a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment thus permits police to search the vehicle without more." *Pennsylvania v. Labron,* 518 U.S. 938, 940, 116 S.Ct. 2485, 135 L.Ed.2d 1031 (1996) (citing *California v. Carney,* 471 U.S. 386, 393, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985)). If the automobile exception applies, there is no requirement of a separate exigency. *Maryland v. Dyson,* 527 U.S. 465, 467, 119 S.Ct. 2013, 144 L.Ed.2d 442 (1999).

¶ 26 The reasons for the automobile exception are twofold: mobility and reduced expectations of privacy. "Besides the element of mobility, less rigorous warrant requirements govern [an automobile search] because the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office." *Carney,* 471 U.S. at 391, 105 S.Ct. 2066 (quoting *South Dakota v. Opperman,* 428 U.S. 364, 367, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976)). "These reduced expectations ... 'justify searches without prior recourse to the authority of a magistrate so long as the overriding standard of probable cause is met.'" *State v. Garrett,* 584 N.W.2d 502, 507 (N.D.1998) (quoting *Carney,* 471 U.S. at 392, 105 S.Ct. 2066).

¶ 27 Probable cause exists when, under the totality of the circumstances, a reasonable person could believe that "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *State v. Burris,* 131 Ariz. 563, 568, 643 P.2d 8, 13 (App.1982). For purposes of the automobile exception, probable cause to conduct "a warrantless search does not vanish once the car has been immobilized." *Michigan v. Thomas,* 458 U.S. 259, 261, 102 S.Ct. 3079, 73 L.Ed.2d 750 (1982) (per curiam); *Chambers v. Maroney,* 399 U.S. 42, 52, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970) (same). As long as probable cause exists, the search need not occur contemporaneously with its lawful seizure. *United States v. Johns,* 469 U.S. 478, 484, 105 S.Ct. 881, 83 L.Ed.2d 890 (1985) (citing *Texas v. White,* 423 U.S. 67, 68, 96 S.Ct. 304, 46 L.Ed.2d 209 (1975) (per curiam); *Chambers,* 399 U.S. at 52, 90 S.Ct. 1975). Thus, even if

an automobile has been impounded or is not otherwise "immediately mobile, the lesser expectation of privacy resulting from its use as a readily mobile vehicle justifie[s] application of the vehicular exception" so long as there was probable cause. *Carney,* 471 U.S. at 391, 105 S.Ct. 2066; *see also Johns,* 469 U.S. at 484–88, 105 S.Ct. 881 (holding vehicle lawfully seized and in police custody may be searched on the basis of probable cause to believe that it contains contraband, without the need to show exigent circumstances); *United States v. Matthews,* 32 F.3d 294, 299 (7th Cir.1994) (finding district court erred when it held that the automobile exception did not apply because the vehicle had been searched after impoundment at the police station); *Garrett,* 584 N.W.2d at 508 (finding permissible a vehicle search conducted after vehicle was moved to the police station because "the police [were] only doing later what they could have done earlier" and "a subsequent search of a vehicle at the station is no greater intrusion on one's privacy interests than a search of the vehicle when it was initially seized").

¶ 28 Here, Prasertphong does not contest the seizure of his vehicle. Thus, if probable cause existed that the vehicle contained contraband when Prasertphong was arrested, then the subsequent searches of his vehicle were lawful.

¶ 29 Before the first search of Prasertphong's truck, the police had information that Prasertphong was involved in the murders, that the murder weapon was a gun, that Prasertphong owned a gun, and that a truck resembling Prasertphong's was seen leaving the area near the Pizza Hut shortly before police arrived. These facts alone gave Detective Wright probable cause to search the vehicle. After the first search proved unsuccessful, Detective Wright received additional information that Prasertphong admitted placing the gun in the wheel well of the spare tire of the truck. As a result, Detective Wright had probable cause to believe that the weapon would be located in the wheel well of the spare tire. Because Prasertphong's vehicle was properly seized and Detective Wright had probable cause to believe that the vehicle contained contraband,

the trial judge did not abuse his discretion in denying Prasertphong's motion to suppress the evidence.

### III.

¶ 30 Prasertphong next contends that the trial court committed reversible error by permitting the introduction of portions of Huerstel's statement to police inculpating Prasertphong.

¶ 31 At trial, Prasertphong, citing Rule 804(b)(3) of the Arizona Rules of Evidence, asked to introduce portions of Huerstel's statement to the police that were self-incriminating. The State agreed that the self-incriminating portions of Huerstel's statement were admissible, but maintained that under Rule 106, Arizona Rules of Evidence, the entire statement, including portions that shifted some responsibility for the crimes to Prasertphong, should be admitted, to avoid misleading the jury. Prasertphong argued that admission of the entire statement would violate his Sixth Amendment right to confront the witnesses against him. The trial judge stated that "because of the nature of the statements and the totality of the circumstances, ... [Huerstel's statements] bear an adequate indicia of reliability." Therefore, "notwithstanding the defendant's confrontation clause argument," if Prasertphong introduced part of Huerstel's statement, the court ruled that the State could introduce the balance of the statement under Rule 106.

¶ 32 We review a trial court's ruling on the admissibility of evidence under exceptions to the rule against hearsay for abuse of discretion. *State v. Tucker,* 205 Ariz. 157, 165, ¶ 41, 68 P.3d 110, 118 (2003). Review of a trial court's determination of a Confrontation Clause violation is *de novo.* *Lilly v. Virginia,* 527 U.S. 116, 137, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999) (plurality opinion).

¶ 33 Arizona Rule of Evidence 106 provides as follows:

> When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought

in fairness to be considered contemporaneously with it.

Under Rule 106, excluded portions of a statement may be introduced if necessary "to explain the admitted portion, place the admitted portion in context, avoid misleading the trier-of-fact, and insure a fair and impartial understanding of the [statement]." *State v. Dunlap,* 187 Ariz. 441, 454–55, 930 P.2d 518, 532–33 (App.1996). After reviewing Huerstel's statement, we agree with the trial court that it would have been misleading to the jury to present Huerstel's statement as Prasertphong suggested. Thus, the trial court did not err in admitting Huerstel's entire statement under Rule 106.

¶ 34 Nevertheless, even though a statement is admissible under a hearsay exception, admission must also satisfy the Confrontation Clause. *See State v. Bass,* 198 Ariz. 571, 580, ¶ 35, 12 P.3d 796, 805 (2000). Prasertphong argues that admission of the entire statement under Rules 804(b)(3) and 106 violated his Confrontation Clause rights. We disagree because Huerstel's statements, when viewed in their entirety, were generally self-inculpatory, and thus bore sufficient indicia of reliability.

■■■ ¶ 35 The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." However, this right of confrontation "is not absolute and must sometimes give way to considerations of public policy." *State v. Nieto,* 186 Ariz. 449, 454, 924 P.2d 453, 458 (App.1996) (citing *State v. Ruelas,* 174 Ariz. 37, 39–40, 846 P.2d 850, 852–53 (App.1992)). "Public policy overrides the [C]onfrontation [C]lause when the declarant is unavailable and his statement bears adequate 'indicia of reliability.'" *Id.*[3] Reliability can be inferred when the statement falls within a "firmly rooted" hearsay exception or the statement "is supported by a 'showing of particularized guarantees of trust-worthiness.'" *Id.* (quoting *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980)).

■■ ¶ 36 The United States Supreme Court declared in *Lilly* that "accomplices' confessions that inculpate a criminal defendant are not within a firmly rooted exception to the hearsay rule." 527 U.S. at 134, 119 S.Ct. 1887. This is so because of the "basic understanding that when one person accuses another of a crime under circumstances in which the declarant stands to gain by inculpating another, the accusation is presumptively suspect and must be subjected to the scrutiny of cross-examination." *Id.* at 132, 119 S.Ct. 1887 (quoting *Lee v. Illinois,* 476 U.S. 530, 541, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986)). However, accomplice statements that are against the declarant's penal interest are admissible "when the circumstances surrounding the statements 'provid[e] considerable assurance of their reliability.'" *Id.* at 130, 119 S.Ct. 1887 (quoting *Chambers v. Mississippi,* 410 U.S. 284, 300, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973)); *see also State v. Bronson,* 204 Ariz. 321, 326, ¶ 23, 63 P.3d 1058, 1063 (App.2003).

■■■ ¶ 37 Rule 804(b)(3) defines a statement against interest. It provides as follows:

A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true.

For purposes of Rule 804(b)(3), a "statement" is generally given a narrow meaning, such that the rule covers "only those declarations or remarks within the confession that are individually self-inculpatory." *Williamson v. United States,* 512 U.S. 594, 599, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994); *see also Nieto,* 186 Ariz. at 455, 924 P.2d at 459. *Williamson* held that the federal equivalent of Arizona Rule of Evidence 804(b)(3) "does not allow admission of non-self-inculpatory statements, even if they are made within a

---

3. A declarant who asserts his Fifth Amendment right not to testify is "unavailable." *Nieto,* 186 Ariz. at 454, 924 P.2d at 458 (citing *State v.*

*Henry,* 176 Ariz. 569, 575, 863 P.2d 861, 867 (1993)).

82

broader narrative that is generally self-inculpatory." 512 U.S. at 600–01, 114 S.Ct. 2431. However, simply because "a statement inculpates another does not mean that the statement, when viewed in context, is not against the penal interest of the declarant." *United States v. Sims,* 879 F.Supp. 828, 832 (N.D.Ill. 1995). As Justice Scalia stated in his concurring opinion in *Williamson,* "[A] declarant's statement is not magically transformed from a statement against penal interest into one that is inadmissible merely because the declarant names another person or implicates a possible codefendant." 512 U.S. at 606, 114 S.Ct. 2431 (Scalia, J. concurring). "What is required after *Williamson* . . . is that the court independently consider each portion of the statement and for each admitted portion find that it is sufficiently against the declarant's penal interest to declare it admissible under Rule 804(b)(3) and the Confrontation Clause." *Sims,* 879 F.Supp. at 832. The trial court here conducted such an inquiry.

 ¶ 38 After hearing arguments and reviewing Huerstel's statement, the trial judge ruled that "[a]ll of [Huerstel's] statements are generally inculpatory." We agree. That Huerstel's statement is also somewhat inculpatory of Prasertphong does not make it any less inculpatory of Huerstel, nor any less reliable. Huerstel's statement differs from Prasertphong's account only in his claims that it was Prasertphong who wanted to rob the Pizza Hut and that Prasertphong shot Moniz first.[4] Had the trial court redacted those portions of the statement as apparently requested by Prasertphong,[5] the jury would still have been left with the obvious inference that Prasertphong shot Moniz. Huerstel told the detectives that when he returned from the restroom, Prasertphong shot Moniz and handed him the gun. Huerstel claimed that he thought Curry was pulling a gun, and that he "freaked out and [he] shot him and [he] shot the other guy." Neither Curry nor Bloxham had a gun or any other weapon. Huerstel also admitted that he shot Moniz the second time after Prasertphong tried to snap her neck.

¶ 39 A redacted version of Huerstel's statement would have had Moniz already shot when Huerstel came out of the restroom; this version still left only one possible shooter: Prasertphong. Moreover, Huerstel's allegations that Prasertphong shot Moniz first and suggested robbing the Pizza Hut did not exculpate Huerstel at the expense of Prasertphong. Thus, Huerstel gained nothing by inculpating Prasertphong. *See Lilly,* 527 U.S. at 132, 119 S.Ct. 1887. The trial court did not err in finding Huerstel's statement, when viewed in context, to be entirely against his penal interest and thus inherently reliable. The entire statement was properly admitted under Rule 106, and admission of the statement did not violate the Confrontation Clause.

## IV.

¶ 40 Prasertphong also asserts that the trial court committed reversible error by denying his motion to suppress his statement to the police because it was obtained in violation of Article 36 of the Vienna Convention on Consular Relations ("VCCR"). Article 36 of the VCCR gives foreign national arrestees the right to consult with a consular official from the arrestee's home nation before answering police questions. Prasertphong argues that his rights under Article 36 of the VCCR were violated when the detectives failed to notify him "without delay" of his right to consult with a consular official of the Thai government.

 ¶ 41 Article 36 of the VCCR provides in relevant part the following:

[I]f [a foreign national arrestee] so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to the consular post

---

4. However, Huerstel's statement to Simmons the morning after the murders had him shooting Moniz first and then "continu[ing] to the back."

5. Prasertphong never specified the portions of Huerstel's statement he wanted to exclude. He merely stated that he wanted to exclude portions which incriminated him.

by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay. The said authorities shall inform the person concerned without delay of his rights under this sub-paragraph.

Vienna Convention on Consular Relations, Apr. 24, 1963, 21 U.S.T. 77, art. 36(1)(b), T.I.A.S. No. 6820, *available at* 1969 WL 97928. The VCCR is binding on the states and local governments under the Supremacy Clause, Article 6, Clause 2 of the United States Constitution. The VCCR's protections are granted to all foreign nationals, "even to foreign nationals who do not benefit from the VCCR." [6] U.S. Dept. of State, Bureau of Consular Affairs, *Instructions for Federal, State, and other Local Law Enforcement and Other Officials Regarding Foreign Nationals in the United States and the Rights of Consular Officials To Assist Them, available at* http://travel.state.gov/consul—notify.html (last accessed August 14, 2003).

▮ ¶ 42 In the context of this case, Prasertphong's claim that Article 36 of the VCCR was violated raises two issues: first, whether Article 36 creates individually enforceable rights, and second, whether the exclusionary rule applies to violations of Article 36. Because the exclusionary rule does not apply to violations of Article 36, we find it unnecessary to decide whether Article 36 creates individually enforceable rights.

¶ 43 Courts have split on whether the VCCR confers individually enforceable rights.[7] Nevertheless, an overwhelming majority of courts have held that even if Article 36 creates individual rights, suppression of evidence is not a remedy for its violation. *See e.g., United States v. Jimenez–Nava,* 243 F.3d 192, 199 (5th Cir.2001), *cert. denied,* 533

U.S. 962, 121 S.Ct. 2620, 150 L.Ed.2d 773 (2001) (holding absent an express provision in a treaty, exclusion of evidence is not an appropriate remedy); *United States v. Chaparro–Alcantara,* 226 F.3d 616, 622 (7th Cir. 2000) (explaining "[o]nly the legislature can require that the exclusionary rule be applied to protect a statutory or treaty-based right"); *United States v. Li,* 206 F.3d 56, 60 (1st Cir.2000) (holding remedies for a VCCR violation do not include suppression); *United States v. Lombera–Camorlinga,* 206 F.3d 882, 885 (9th Cir.2000) (en banc); *United States v. Cordoba–Mosquera,* 212 F.3d 1194, 1195–96 (11th Cir.2000), *cert. denied sub nom., Zuniga v. United States,* 531 U.S. 1131, 121 S.Ct. 893, 148 L.Ed.2d 800 (2001); *State v. Buenaventura,* 660 N.W.2d 38, 46 (Iowa 2003); *Commonwealth v. Diemer,* 57 Mass.App.Ct. 677, 785 N.E.2d 1237, 1244–45 (2003), *review denied,* 439 Mass. 1106, 790 N.E.2d 1089 (2003). We agree with the holdings of these courts. Accordingly, the trial court did not abuse its discretion in denying the motion to suppress based on a violation of Article 36 of the VCCR. *See Lombera–Camorlinga,* 206 F.3d at 888.

### V.

▮ ¶ 44 Prasertphong next argues that his statement to the police was involuntary and therefore the trial court's failure to suppress the statement violated his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article 2, Sections 4 and 10 of the Arizona Constitution.

¶ 45 Prasertphong filed a motion to suppress his audio taped statement to the detectives. He claimed his statement was involuntary because the detectives made improper

---

6. Thailand was not a signatory to the VCCR until after Prasertphong's arrest.

7. Compare cases holding that Article 36 does create individually enforceable rights, *Standt v. City of New York,* 153 F.Supp.2d 417, 427 (S.D.N.Y.2001); *United States v. Hongla–Yamche,* 55 F.Supp.2d 74, 78 (D.Mass.1999); *United States v. Torres–Del Muro,* 58 F.Supp.2d 931, 933 (C.D.Ill.1999); *Breard v. Pruett,* 134 F.3d 615, 622 (4th Cir.1998), with cases holding that Article 36 does *not* create such rights. *See United States v. Jimenez–Nava,* 243 F.3d 192, 198 (5th

Cir.2001), *cert. denied,* 533 U.S. 962, 121 S.Ct. 2620, 150 L.Ed.2d 773 (2001); *United States v. Emuegbunam,* 268 F.3d 377, 392 (6th Cir.2001), *cert. denied,* 535 U.S. 977, 122 S.Ct. 1450, 152 L.Ed.2d 392 (2002); *State v. Martinez–Rodriguez,* 131 N.M. 47, 33 P.3d 267, 273 (2001), *cert. denied,* 535 U.S. 937, 122 S.Ct. 1317, 152 L.Ed.2d 225 (2002); *United States v. Lombera–Camorlinga,* 206 F.3d 882, 885 (9th Cir.2000) (en banc); *United States v. Li,* 206 F.3d 56, 66 (1st Cir.2000).

**84**

threats, promises, and offers of leniency while the tape recorder was turned off. At the suppression hearing, Prasertphong testified that Detective Olivas stated while the recorder was off, "How about I take you out to the desert and shoot you," and then grabbed Prasertphong by the throat and hit his head against the wall. Prasertphong also testified that Detective Olivas suggested that if Prasertphong cooperated they would help him get a life sentence rather than the death penalty. When Prasertphong still refused to make a statement, he was told, "Tell us what you know and we'll release you after this." Prasertphong testified it was at that point he agreed to make a recorded statement.

¶ 46 Both detectives denied making any threats or promises to Prasertphong. Detective Charlton testified that he never discusses the death penalty in interviews. Although the trial court admonished the detectives for their failure to record the entire interview with Prasertphong,[8] it denied the motion to suppress, finding that any untaped comments did not affect the voluntariness of Prasertphong's statement.

¶ 47 The credibility of the detectives was later called into question when it was revealed that in an unrelated interview, Detective Charlton told an arrestee that he "may be facing the death penalty." In that case, a report prepared by Detective Olivas confirmed that the statement was made and that the defendant agreed to make a statement if the detectives promised that he would receive a life sentence instead of the death penalty. After discovering this information, Prasertphong filed a motion to reconsider the denial of his motion to suppress. The trial court denied the motion to reconsider.

 ¶ 48 We view the facts presented at the suppression hearing in the light most favorable to upholding the trial court's factual findings but review its legal conclusions *de novo*. *State v. Hyde*, 186 Ariz. 252, 265, 921 P.2d 655, 668 (1996); *State v. Schinzel*, 202 Ariz. 375, 378, ¶ 12, 45 P.3d 1224, 1227 (App. 2002). We review a trial court's decision to admit a defendant's statements for abuse of

discretion. *State v. Jones*, 203 Ariz. 1, 5, ¶ 8, 49 P.3d 273, 277 (2002), opinion supplemented by 205 Ariz. 445, 72 P.3d 1264 (2003).

 ¶ 49 Confessions are presumed involuntary, and the state has the burden of proving otherwise by a preponderance of the evidence. *State v. Lacy*, 187 Ariz. 340, 346, 929 P.2d 1288, 1294 (1996). To be deemed voluntary within the meaning of the Fifth Amendment to the United States Constitution, a statement or confession must not have been induced by any "direct or implied promises, however slight," *State v. Tapia*, 159 Ariz. 284, 290, 767 P.2d 5, 11 (1988), "nor by the exertion of any improper influence" or physical threats. *Malloy v. Hogan*, 378 U.S. 1, 7, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964) (citation omitted); *Townsend v. Sain*, 372 U.S. 293, 307, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), *overruled on other grounds by Keeney v. Tamayo–Reyes*, 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992). The trial court must look to the totality of the circumstances to determine whether a defendant's will has been overborne. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). A confession is rendered involuntary as the result of a promise if two requirements are met: First, there must be an express or implied promise, and second, the defendant must rely on the promise in making the confession. *State v. Doody*, 187 Ariz. 363, 370, 930 P.2d 440, 447 (App.1996) (citations omitted).

 ¶ 50 When, as here, there is a conflict between a defendant's testimony and that of the police, resolution of that conflict is left to the trial court. *Tapia*, 159 Ariz. at 288, 767 P.2d at 9. "A prima facie case for admission of a confession is made when the officer testifies that the confession was obtained without threat, coercion or promises of immunity or a lesser penalty." *State v. Jerousek*, 121 Ariz. 420, 424, 590 P.2d 1366, 1370 (1979). The detectives' testimony that they had neither made promises, nor used threats or coercion established a prima facie case for admission of Prasertphong's statement. And

---

**8.** We reiterate the admonitions expressed in *State v. Jones. See* 203 Ariz. 1, 7, ¶ 18, 49 P.3d 273, 279 (2002) (commenting that the better practice

is to tape the entire interrogation process), opinion supplemented by 205 Ariz. 445, 72 P.3d 1264 (2003).

even after the detectives' credibility was called into question, the trial judge still found their testimony credible under the totality of the circumstances.

¶ 51 On appeal, Prasertphong relies on *State v. Thomas*, 148 Ariz. 225, 226, 714 P.2d 395, 396 (1986), a case in which a defendant confessed to child molestation after being told that a confession might help him avoid a prison sentence in favor of jail time and counseling. In that case, almost immediately after making the audio taped confession, the defendant recanted his statement. *Id.* at 226–27, 714 P.2d at 396–97. This court held that because of the promise of leniency, combined with the defendant's persistent assertions of innocence, the evidence was insufficient to prove voluntariness by a preponderance of the evidence. *Id.* at 228, 714 P.2d at 398.

¶ 52 *Thomas* differs significantly from this case. In *Thomas*, the detective did not deny promising leniency. 148 Ariz. at 227, 714 P.2d at 397. Here, the detectives adamantly denied hitting Prasertphong, denied making any promises of leniency in exchange for a statement, and claimed that the death penalty is never a consideration in questioning defendants. Other than Prasertphong's testimony, there is no evidence of an express or implied promise and no evidence that the detectives either physically harmed Prasertphong or threatened to do so. And even if any of these events had occurred, Prasertphong testified at the suppression hearing that he did not rely on the alleged physical intimidation or suggestion that if he cooperated he would not receive the death penalty. Rather, he testified he chose to give the detectives a statement only after they promised he would be released in exchange for the statement. The trial court did not find this or any of Prasertphong's other allegations credible.

¶ 53 Viewing the facts in the light most favorable to sustaining the trial court's determination, we conclude that the trial court did not abuse its discretion in determining that Prasertphong's statement was not given in reliance on assurances by the detectives or as a result of impermissible police interrogation tactics. *See State v. Hensley*, 137 Ariz. 80, 87, 669 P.2d 58, 65 (1983) (finding defendant did not give statement in reliance on promise that statement would not be admissible in court because defendant made the statement the next day to different police officers after being read his *Miranda* rights). The trial court did not err in denying Prasertphong's motion to suppress his statements.

## VI.

¶ 54 Prasertphong also contends his due process rights were violated and he was prejudiced because the juror questionnaire told the prospective jurors that he is not a United States citizen. The questionnaire presented the following question:

> Kajornsak Prasertphong is from Thailand and is a Thai citizen, although he has been living in this country for eleven (11) years. Think about your views of oriental men. Is there anything about how you feel about oriental men that would make it difficult for you to be a fair and impartial juror in this case?

¶ 55 Arizona Rule of Criminal Procedure, 18.5(e) provides that "[t]he examination of prospective jurors shall be limited to inquiries directed to bases for challenge for cause or to information to enable the parties to exercise intelligently their peremptory challenges." "The method and scope of voir dire is left to the discretion of the trial judge." *State v. Cañez*, 202 Ariz. 133, 148, ¶ 37, 42 P.3d 564, 579 (2002) (citing *State v. Detrich*, 188 Ariz. 57, 64–65, 932 P.2d 1328, 1335–36 (1997) (*Detrich II* )), opinion supplemented by 205 Ariz. 620, 403 Ariz. Adv. Rep. 24, 74 P.3d 932 (2003). Unless the trial court abuses its discretion, there is no reversible error. *State v. Melendez*, 121 Ariz. 1, 3, 588 P.2d 294, 296 (1978) (citing *State v. Smith*, 114 Ariz. 415, 418, 561 P.2d 739, 742 (1977)); *State v. (Jessie) Lopez*, 134 Ariz. 469, 471, 657 P.2d 882, 884 (App.1982).

¶ 56 At trial, Prasertphong objected to the question, arguing that information regarding his citizenship was irrelevant and extremely

prejudicial.[9] On appeal, he contends that the only possible relevance to the information "would be to let the jury know it did not have to accord him all the rights associated with citizenship as he was not in fact a citizen." Prasertphong cites no cases to support this assertion and presents no evidence that the jury considered Prasertphong's citizenship status in rendering its verdict.

¶ 57 "The purpose of *voir dire* examination is to determine whether prospective jurors can fairly and impartially decide the case at bar." *State v. Baumann*, 125 Ariz. 404, 409, 610 P.2d 38, 43 (1980). The trial court must ask prospective jurors questions "it deems necessary to determine their qualifications," *State v. McMurtrey*, 136 Ariz. 93, 99, 664 P.2d 637, 643 (1983), and that will "unveil a juror's prejudices." *State v. Verive*, 128 Ariz. 570, 576, 627 P.2d 721, 727 (App.1981). Under the circumstances of this case, inquiry into whether Prasertphong's nationality would affect a potential juror's ability to be fair was logical. For example, during Prasertphong's statement to the police, he told them that he had been born in Thailand but could speak English fluently "except for the big words." Accordingly, the trial court did not abuse its discretion in asking the potential jurors whether Prasertphong's race and citizenship status would affect their ability to be fair and impartial.

## VII.

¶ 58 Prasertphong next claims that he was "denied equal protection of the law under the Fourteenth Amendment to the United States Constitution when he was convicted by a jury whose selection was tainted by the state's exercise of its peremptory strikes in a discriminatory manner." He argues that the trial court's error entitles him to a new trial.

¶ 59 The State peremptorily struck the only prospective juror of Asian descent. Prasertphong challenged the strike based on *Batson v. Kentucky*, 476 U.S. 79, 89, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), in which the

United States Supreme Court held that the Equal Protection Clause of the Fourteenth Amendment forbids a prosecutor from striking jurors based on race. The State explained that it struck the juror because "she clearly did not want to sit on this jury" and the prosecutor "didn't want somebody sitting here three weeks that didn't want to be here." The trial court found this explanation to be nondiscriminatory and denied Prasertphong's *Batson* challenge.

¶ 60 Denial of a *Batson* challenge will not be reversed unless it was clearly erroneous. *State v. Harris*, 184 Ariz. 617, 618, 911 P.2d 623, 624 (App.1995). "We review de novo the trial court's application of the law." *State v. Lucas*, 199 Ariz. 366, 368, 18 P.3d 160, 162 (App.2001), *cert. denied*, 534 U.S. 1014, 122 S.Ct. 506, 151 L.Ed.2d 415 (2001).

¶ 61 *Batson* sets forth a three step process to determine if a juror has been discriminatorily struck. First, the defendant must make a prima facie showing that the strike was made on the basis of race. Second, the burden then switches to the prosecutor, who must give a race-neutral explanation for the strike. Third, if the prosecutor offers a facially neutral basis for the strike, the trial court must determine if the reason given is pretextual and actually based on race. *Batson*, 476 U.S. at 97–98, 106 S.Ct. 1712; *State v. Trostle*, 191 Ariz. 4, 12, 951 P.2d 869, 877 (1997).

¶ 62 A request by the trial court for an explanation of a peremptory strike is an implicit finding that a prima facie case of discrimination has been made. *Trostle*, 191 Ariz. at 12, 951 P.2d at 877; *State v. Hernandez*, 170 Ariz. 301, 304, 823 P.2d 1309, 1312 (App.1991). Because the court made such a request here, *Batson's* first factor was satisfied and the burden then shifted to the State to come forward with a race-neutral explanation. *Purkett v. Elem*, 514 U.S. 765, 767, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). This second factor "does not demand an explana-

---

9. The State argues that the objections "irrelevant" and "extremely prejudicial" were insufficient to preserve the issue for review. We dis-

agree and find the objection sufficient to satisfy the specificity requirement of Arizona Rule of Evidence 103.

tion that is persuasive, or even plausible." *Id.* at 768, 115 S.Ct. 1769. Rather, all that is required is "facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Hernandez v. New York*, 500 U.S. 352, 360, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (plurality opinion). It is not until step three "that the persuasiveness of the justification becomes relevant—the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination." *Purkett*, 514 U.S. at 768, 115 S.Ct. 1769 (citations omitted). "At that stage, implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Id.; see also Miller–El v. Cockrell*, 537 U.S. 322, 123 S.Ct. 1029, 1040, 154 L.Ed.2d 931 (2003).

¶ 63 Here, the State claimed to have struck the juror because she preferred not to sit on the jury, explaining that she "tried every which way she could think of to get off the jury." This reason is facially race neutral. Therefore, under the third *Batson* factor, the trial court had to determine whether this reason was pretextual and actually based on race. *Batson*, 476 U.S. at 96–98, 106 S.Ct. 1712; *see also Purkett*, 514 U.S. at 767, 115 S.Ct. 1769; *Hernandez*, 500 U.S. at 358–59, 111 S.Ct. 1859; *Trostle*, 191 Ariz. at 12, 951 P.2d at 877. The trial court did not expressly rule on this factor.

¶ 64 Nevertheless, the prosecutor offered several examples of the juror's statements that led him to believe that she did not want to serve.[10] A strike based upon a juror's reluctance to serve is non-discriminatory. *See State v. Sanderson*, 182 Ariz. 534, 540, 898 P.2d 483, 489 (App.1995). We defer to the trial court's implicit finding that the

State's reason for striking this juror was non-discriminatory. Therefore, the trial court's denial of Prasertphong's *Batson* challenge was not clearly erroneous.

## VIII.

¶ 65 Prasertphong next asserts the following five points of error with regard to jury instructions given at trial: (a) the trial court erred in declining to instruct on theft as a lesser included offense of armed robbery; (b) the court's mere presence instruction was incomplete; (c) the court erred in not instructing regarding "late joiners"; (d) the court erred by giving an incomplete accomplice instruction; and (e) the court gave an unconstitutional reasonable doubt instruction. We review a trial court's denial of a requested jury instruction for an abuse of discretion. *State v. Bolton*, 182 Ariz. 290, 309, 896 P.2d 830, 849 (1995). Review of whether an instruction correctly stated the law is *de novo. State v. Orendain*, 188 Ariz. 54, 56, 932 P.2d 1325, 1327 (1997).

### A.

¶ 66 Prasertphong requested a jury instruction on theft as a lesser included offense of armed robbery, which the trial court refused. He argued that his statement to the police, as well as the evidence, supported his theory that he was merely present at the scene and had no intent to rob or kill anyone at the Pizza Hut. Thus, he maintains an instruction on the lesser included offense of theft was required.

¶ 67 Arizona Rule of Criminal Procedure 23.3 requires courts to instruct juries on offenses "necessarily included in the offense charged." *State v. Valenzuela*, 194 Ariz. 404, 406, ¶¶ 10–11, 984 P.2d 12, 14 (1999); *State v.*

---

10. Throughout *voir dire*, the juror stated that she would prefer not to "sit on a jury like this" in which she may have to look at disturbing photographs. She also stated that in her position with the Yavapai County Adult Probation Department, she worked with, and knew, several county attorneys and public defenders. She did not know if or how this would affect her decision in this case because "a lot of them [the attorneys] have opinions ... and they're loud about it." She also stated that she had two friends who were victim-

ized at gunpoint, but felt that her decision in this case would be unaffected by those events. Of greater concern to the juror was the hardship serving on a three-week jury trial would cause her. She had a chronic back injury and was under a doctor's care, she recently had her medication switched and the new medication made her drowsy, and she had primary responsibility of taking care of her two teenage children because her husband was not in good health.

*Krone,* 182 Ariz. 319, 323, 897 P.2d 621, 625 (1995). Theft is a lesser included offense of armed robbery. *State v. Kinkade,* 147 Ariz. 250, 253, 709 P.2d 884, 887 (1985).

¶ 68 When a defendant requests a lesser included offense instruction that is supported by the evidence, failure to give the requested instruction constitutes fundamental error if the failure impedes the defendant's ability to present his defense. *Valenzuela,* 194 Ariz. at 407, ¶ 15, 984 P.2d at 15. To determine whether the evidence requires giving of theft as a lesser included offense of armed robbery, "the test is 'whether the jury could rationally fail to find the distinguishing element of the greater offense.' " *Krone,* 182 Ariz. at 323, 897 P.2d at 625 (quoting *State v. Detrich,* 178 Ariz. 380, 383, 873 P.2d 1302, 1305 (1994) (*Detrich I* )) (quoting *State v. (Vivian Rhea) Noriega,* 142 Ariz. 474, 481, 690 P.2d 775, 782 (1984), *overruled on other grounds by State v. Burge,* 167 Ariz. 25, 28 n. 7, 804 P.2d 754, 757 n. 7 (1990)).

¶ 69 Robbery is the taking of property of another by means of threat or use of force against any person. A.R.S. § 13–1902 (2001). An armed robbery occurs "if, in the course of committing a robbery ... such person or an accomplice: 1. Is armed with a deadly weapon ... or 2. Uses or threatens to use a deadly weapon." A.R.S. § 13–1904. It is not necessary that a defendant "uses or threatens to use a deadly weapon" so long as the accomplice does so. *State v. McNair,* 141 Ariz. 475, 479, 687 P.2d 1230, 1234 (1984).

¶ 70 Theft, on the other hand, occurs when a person "knowingly" and "without lawful authority" controls "property of another with the intent to deprive the other person of such property." A.R.S. § 13–1802(A)(1) (2001). The key to distinguishing between robbery and theft turns on whether a defendant's intent to commit a theft coexisted with his use of force. *State v. (George Villegas) Lopez,* 158 Ariz. 258, 263, 762 P.2d 545, 550 (1988). A robbery may be established when the use of force precedes the actual taking of property, so long as the intent to take another's property accompanies the use of force. *State v. Comer,* 165 Ariz. 413, 421, 799 P.2d 333, 341 (1990). It

follows then that if the requisite force does not coexist with the intent to take the property, the taking is a theft but is not a robbery. *Lopez,* 158 Ariz. at 264, 762 P.2d at 551.

¶ 71 On appeal, Prasertphong admits that he took the debit card machine after Huerstel killed all three victims but argues that this did not constitute an armed robbery because his intent to steal was not contemporaneous with the force used against the victims. But at trial, counsel for Prasertphong conceded that a robbery occurred with respect to Curry, stating, "I guess as to [Curry] there would have been an armed robbery." His counsel also told the trial court during the settling of jury instructions that the taking of the debit card machine was "separate from the taking and the use of force that was used to take the [bank] bag. . . . That's the reason why we've submitted theft as a lesser included of armed robbery, because the jury could believe that [Prasertphong] didn't have a thing to do with the armed robbery." But the State based its theory of the armed robbery exclusively on the taking of the bank bag. It mentioned the taking of the debit card machine only as evidence of Prasertphong's attempt to cover up his participation in the crimes.

¶ 72 Consequently, as presented to the trial court, the taking of the debit card machine was a separate offense and not an included offense of robbery. Accordingly, no factual predicate existed to justify giving a theft instruction as a lesser included offense of robbery based on the taking of the debit card machine.

¶ 73 Moreover, in his statement to the police, Prasertphong was asked, "Did you guys take money?" and "Did you guys take any ... checks?" Prasertphong twice responded affirmatively telling the detectives that "[i]t was all checks." He also told the detectives that Huerstel did not take anything from the business. Thus, it is apparent that Prasertphong, rather than Huerstel, took the bank bag. Additionally, Prasertphong admitted to the detectives that he personally used force against Moniz. The requisite force required for an armed rob-

bery need only "be used 'against any person,' not necessarily only against the person dispossessed of the property." *State v. Soto–Fong,* 187 Ariz. 186, 200, 928 P.2d 610, 624 (1996) (quoting *State v. McGuire,* 131 Ariz. 93, 96, 638 P.2d 1339, 1342 (1982)); *State v. Rutledge,* 197 Ariz. 389, 393–94, ¶¶ 17–21, 4 P.3d 444, 448–49 (App.2000). In *Soto–Fong,* three victims were killed during the robbery of a market, but property was taken from only one of the victims. The court affirmed the robbery charges as to all three victims, finding that force was used to prevent all three of the victims from resisting the taking of property from the market. *Soto–Fong,* 187 Ariz. at 200, 928 P.2d at 624.

¶ 74 Similarly, in this case, three victims were killed during a robbery of the Pizza Hut, but property was only taken from one— Curry. Thus, under *Soto–Fong,* any robbery that occurred in this case was committed against all three of the victims. Based on the evidence presented at trial, we conclude that even if Prasertphong was not the person who used force against Curry, he was nevertheless an accomplice to the armed robbery. He used force against Moniz, and his counsel conceded that the taking of the bank bag constituted a robbery. No reasonable jury, having been instructed on theft as a lesser included offense of robbery, could have determined that Prasertphong committed theft rather than armed robbery. *See Comer,* 165 Ariz. at 421, 799 P.2d at 341. Consequently, theft of the debit card machine was properly considered separately and not as a lesser included offense of armed robbery involving the bank bag. The trial court did not abuse its discretion in refusing the requested lesser included offense instruction.

### B.

¶ 75 Prasertphong requested the following mere presence instruction at trial:

In order to find the defendant guilty of the crime, the prosecution must prove, beyond a reasonable doubt, that in addition to being present or knowing about the crime, the defendant knowingly associated himself with the crime in some way as a participant, as someone who wanted the crime to be committed, and not merely as a knowing spectator.

That instruction was refused, and the following instruction was given: "The mere presence of a defendant at the scene of a crime, together with knowledge a crime is being committed, is insufficient to establish guilt."

¶ 76 Prasertphong argues the given instruction was constitutionally infirm because it did not reflect that he did not knowingly participate in the crimes and did not express that mere association is insufficient for guilt. We disagree. "[W]hen a jury is properly instructed on the applicable law, the trial court is not required to provide additional instructions that do nothing more than reiterate or enlarge the instructions in defendant's language." *State v. Salazar,* 173 Ariz. 399, 409, 844 P.2d 566, 576 (1992); *see also State v. Mott,* 187 Ariz. 536, 546, 931 P.2d 1046, 1056 (1997).

¶ 77 The trial court's mere presence instruction correctly stated the law. *State v. (Pedro) Noriega,* 187 Ariz. 282, 284, 928 P.2d 706, 708 (App.1996). Additionally, the court's instructions on the prosecution's burden of proof, the presumption of innocence, the elements of the offenses, and the nature of liability as a principal or an accomplice adequately informed the jury that Prasertphong could not be convicted of the crimes merely because he "associated" with Huerstel. The court therefore did not abuse its discretion in refusing to give Prasertphong's proffered instruction.

### C.

¶ 78 Prasertphong next argues that the felony murder and accomplice liability instructions were deficient because they referred only generally to accomplice liability for murders occurring "in the course of" and "in furtherance of" armed robberies and did not refer to robberies occurring after someone else has killed another person.

¶ 79 Instead, Prasertphong requested instructions that told the jury that before it could find him guilty of felony murder, it had to find that he and Huerstel jointly planned and committed an armed robbery during which a murder occurred, and that he did not

merely take property after the murders. Prasertphong cites *People v. Pulido*, 15 Cal.4th 713, 63 Cal.Rptr.2d 625, 936 P.2d 1235 (Cal.1997), for the proposition that if a defendant does not have a joint plan to assist in the robbery ahead of time, then he is not guilty of felony murder by merely taking part in the robbery after the killings. According to Prasertphong, the instructions given at trial did not cover his theory of the case that "[i]f the defendant did not have a joint plan to help the robbery AHEAD of time, then he is not guilty of felony murder merely by taking part in the robbery AFTER the killings." Therefore, it was constitutional error for the court to refuse to give his requested instructions. We disagree.

¶ 80 In *Pulido*, the California Supreme Court held that "[i]f one person, acting alone, kills in the perpetration of a robbery, and another person *thereafter* aids and abets the robber in the asportation and securing of the property taken," the second person is not guilty of first degree murder. 63 Cal. Rptr.2d 625, 936 P.2d at 1236. Although the jury there was not instructed that "late joiners" were not liable for felony murder, the court held that any resulting error was harmless because under other, properly given instructions, "the jury thus found—explicitly, unanimously, and necessarily—that defendant's involvement in the robbery, whether as direct perpetrator or as aider and abettor, commenced before or during the killing." *Id.* at 1244.

■■■■ ¶ 81 The instructions in this case told the jury that

A person commits first degree [felony] murder if such person, acting alone or with one or more other persons, commits robbery or armed robbery and *in the course of, and in furtherance of such offense, or immediate flight from such offense,* such person, or another person causes the death of any person.

(Emphasis added.) This instruction tracks the language of A.R.S. section 13–1105(A)(2) (2001). We have encouraged trial courts to closely follow statutory language when instructing on felony murder. *State v. Wiley*, 144 Ariz. 525, 540, 698 P.2d 1244, 1259 (1985), *overruled on other grounds by State ex rel.*

*Criminal Div. of Attorney General v. Superior Court*, 157 Ariz. 541, 544, 760 P.2d 541, 544 (1988). Additionally, the court instructed the jury that a robbery requires proof that

1) The Defendant took another person's property; 2) The taking was from the other person's person or immediate presence; 3) The taking was against the other person's will; [and] 4) The Defendant threatened or used force against any person with the intent to coerce surrender of the property or to prevent resistance to taking or keeping the property.

Finally, the court's accomplice instruction informed the jury that a person is criminally responsible for the conduct of another if

with the intent to promote or help in the commission of an offense [he]: 1. Aids, counsels, agrees to aid, or attempts to aid another person in planning or committing the offense; 2. Asks or commands another person to commit the offense; or 3. Provides the means or an opportunity to another person to commit the offense.

¶ 82 The trial court found these instructions adequately covered Prasertphong's theory that he was a "late joiner." The record supports the trial court's decision. The instructions the court gave correctly stated the law. *See State v. Henry*, 176 Ariz. 569, 582, 863 P.2d 861, 874 (1993) (finding robbery instruction that defendant "threatened or used force with the intent either to coerce the surrender of the property or to prevent resistance to his taking or retaining the property" adequately informed the jurors of the co-existence requirement and provided an adequate basis for felony murder conviction); *State v. Doerr*, 193 Ariz. 56, 65, ¶ 35, 969 P.2d 1168, 1177 (1998) (holding "[w]here the law is adequately covered by instructions as a whole, no reversible error has occurred."). Therefore, refusal to give Prasertphong's proffered instructions was not an abuse of discretion.

### D.

¶ 83 Prasertphong also claims that the standard accomplice instruction given at trial was deficient because it did not adequately emphasize that unknowing aid (having the

gun in the truck), or a lack of intent to steal during the commission of the murders, did not amount to accomplice liability.[11] Because the court refused Prasertphong's more specific instructions regarding accomplice liability, he contends constitutional error occurred.

¶ 84 The accomplice instruction given at trial tracked the language of the statute. *See* A.R.S. § 13–301 (2001). It properly told the jurors that accomplice liability requires the *intent* to promote the offense as evidenced by actions such as soliciting, aiding, promoting, or providing the means for another person to commit an offense. A defendant should receive instructions on any theory of a case supported by the evidence. *Valenzuela*, 194 Ariz. at 405, ¶ 2, 984 P.2d at 13. However, a jury need only be properly instructed as to accomplice liability; the court need not provide "additional instructions that do nothing more than reiterate or enlarge the instructions in defendant's language." *Salazar*, 173 Ariz. at 409, 844 P.2d at 576. Because the instruction here correctly stated the law, the trial court did not abuse its discretion.

### E.

¶ 85 Prasertphong argues that the court's reasonable doubt instruction taken from *State v. Portillo*, 182 Ariz. 592, 898 P.2d 970 (1995), was erroneous and resulted in fundamental and reversible error. According to Prasertphong, the *Portillo* instruction decreased the State's quantum of evidence required to show proof beyond a reasonable doubt, increased Prasertphong's quantum of evidence needed to acquit, and erroneously and confusingly referenced different standards of proof that apply to civil and criminal cases.

¶ 86 This court mandates the giving of the *Portillo* reasonable doubt instruction in every criminal case. *Portillo*, 182 Ariz. at 596, 898 P.2d at 974. We explicitly held that the *Portillo* reasonable doubt instruction did not improperly shift the burden of proof to the defendant. *State v. Finch*, 202 Ariz. 410,

415, ¶ 18, 46 P.3d 421, 426 (2002); *see also Cañez*, 202 Ariz. at 156, ¶¶ 75–76, 42 P.3d at 587. Because we require trial courts to give the *Portillo* reasonable doubt instruction, and because the instruction does not improperly shift the burden of proof, the trial court did not commit fundamental error when it gave the *Portillo* instruction.

### IX.

¶ 87 Next, Prasertphong contends that it was fundamental error for the indictment and verdict forms to allege that Prasertphong robbed each victim "and/or Pizza Hut." Under A.R.S. section 13–1902, robbery must be a taking by force or threat of force against a person, not a business. Therefore, according to Prasertphong, the portion of the indictment alleging a taking by force against the Pizza Hut, and the verdict forms tracking that language, were erroneous. Because the verdict forms were not objected to at trial, we review only for fundamental error. *State v. Gendron*, 168 Ariz. 153, 154, 812 P.2d 626, 627 (1991).

¶ 88 Citing *State v. Van Vliet*, 108 Ariz. 162, 163, 494 P.2d 34, 35 (1972), the State argues that the sufficiency of a robbery charge is unaffected by who is named as the victim when the defendant had notice of the basic facts of the crime alleged. However, in *Van Vliet* the indictment was amended before trial. *Id.* Nevertheless, so long as the defendant has notice of the essential facts of the crime alleged, any error in the indictment is harmless. *Id.; see also State v. James*, 305 So.2d 514, 516–17 (La.1974) (holding that although charged with armed robbery of a gas company, the defendant received adequate notice of the charge against him and was not prejudiced by the indictment).

¶ 89 There is little question that Prasertphong understood the charges against him. And the error was cured by the instructions to the jury. For example, the trial court instructed the jury that "[t]he indictment is

---

11. The State argues that Prasertphong waived this objection by failing to object below. We disagree. Prasertphong specifically objected to the accomplice instruction and the mere pres-

ence instruction at the same time. The court read the two instructions and an exchange followed between counsel and the court during which both instructions were discussed.

not evidence against the defendant," that robbery required proof that the defendant took another person's property "from the other person's *person* or immediate presence," and also required the taking to be against "the person's" will and that force was used against "any person." (Emphasis added.) Given these instructions, the jury doubtlessly understood that for a robbery to occur, the property had to be taken from and the force had to be used against the employees of the Pizza Hut, rather than the Pizza Hut itself. As a whole, the jury instructions sufficiently explained the crime of robbery to the jury to assure Prasertphong a fair trial.

## X.

¶ 90 Prasertphong finally argues that the use of dual juries requires reversal because the procedure violated his constitutional right to have a trial free from the antagonistic defense of his co-defendant. At trial, Prasertphong objected to the use of the dual jury procedure, arguing that there were few witnesses in common and that most of the evidence would not be jointly presented because of the antagonistic defenses of the co-defendants. Despite the objection, the trial court employed the dual jury procedure. Because Prasertphong did not suffer actual prejudice, the State argues that reversal is not required. *See State v. Lambright,* 138 Ariz. 63, 69–70, 673 P.2d 1, 7–8 (1983), *overruled on other grounds by Hedlund v. Sheldon,* 173 Ariz. 143, 146, 840 P.2d 1008, 1011 (1992). We review a trial judge's decision to employ a dual jury procedure for abuse of discretion. *Hedlund,* 173 Ariz. at 143, 840 P.2d at 1008.

¶ 91 Dual jury trials permit co-defendants to be tried simultaneously by different juries, with each jury hearing only the evidence admissible against the particular defendant whose case it must decide. The procedure often provides a solution to problems of co-defendant statements under the *Bruton* rule, and of the resulting prejudice when co-defendants assert antagonistic defenses during a joint trial. Annotation, *Propriety of Use of Multiple Juries at Joint Trial of Multiple Defendants in State Criminal Prosecution,* 41 A.L.R.4th 1189, 1190 (1985); Am Jur.2d

*Trial* § 162 (1991); *see also Bruton v. United States,* 391 U.S. 123, 137, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). The procedure also helps eliminate some of the general problems of duplication of effort, expense, and time that might occur in separate trials. 41 A.L.R.4th at 1190–91.

¶ 92 Use of dual juries is acceptable when the result avoids the "spectacle" of antagonistic defenses. *People v. Brooks,* 92 Mich.App. 393, 285 N.W.2d 307, 308 (1979). This court has generally approved the use of dual juries, recognizing that trial judges have broad discretion to employ particular trial techniques to meet a specific problem in a single case. *Hedlund,* 173 Ariz. at 146, 840 P.2d at 1011. However, we warned that although the dual jury procedure was not unconstitutional or prejudicial per se, a judge should consider the nature of the offense in determining whether to employ a dual jury in a capital case. *Id.*

¶ 93 Here, Prasertphong and Huerstel were charged with the same crimes but presented antagonistic defenses. After granting a motion to sever the trials, the trial judge determined that a dual jury procedure would be more efficient than separate trials. The juries were instructed that the procedure was being used because "while most of the evidence is admissible against both defendants, some of the evidence is only admissible against one of the defendants."

¶ 94 In this case, the charges against both codefendants were read in the presence of both juries. As in *Hedlund,* the judge here anticipated that outside of the codefendant's statements to police, virtually all of the evidence would be admissible against both defendants. Furthermore, following the lead of *Hedlund,* the opening and closing statements, as well as jury instructions, were given to each jury separately.

¶ 95 Contrary to Prasertphong's argument, *Hedlund* did not hold that dual juries are only appropriate when "virtually all" of the evidence is admissible against both defendants. Rather, as here, the court noted that the procedure was employed because it "appeared" to the trial judge that virtually all of the evidence would be admissible against

both defendants. *See Hedlund,* 173 Ariz. at 144, 840 P.2d at 1009. Although more separation of the juries than initially expected occurred, that circumstance does not render use of the dual jury procedure prejudicial to Prasertphong. Because use of dual juries is permissible and not per se prejudicial, and because there is no evidence of prejudice in this case, the trial court did not abuse its discretion in using dual juries.

¶ 96 Although we find no prejudice in this particular case, we reiterate the admonition from *Hedlund* that a judge should seriously consider the nature of the offense in determining whether to employ a dual jury. 173 Ariz. at 146, 840 P.2d at 1011. Only rarely will dual juries be appropriate in a capital case. Nevertheless, Prasertphong has not demonstrated prejudicial error justifying reversal in this case.

### XI.

¶ 97 In compliance with *Jones,* 203 Ariz. at 12, ¶ 43, 49 P.3d at 284, and the June 27, 2002 consolidation order issued by this court as a result of *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), sentencing issues related to the death penalty were not addressed by the parties but will be addressed in supplemental briefing as ordered by this court.

### XII.

¶ 98 For the reasons discussed, the convictions are affirmed. The sentences for the armed robberies and the life sentence for the death of Curry are affirmed. The death sentences for the murders of Moniz and Bloxham will be addressed in a supplemental opinion.

CONCURRING: CHARLES E. JONES, Chief Justice, RUTH V. McGREGOR, Vice Chief Justice, REBECCA WHITE BERCH, Justice and CECIL B. PATTERSON, JR., Judge (Retired).*

---

* NOTE: Justice Andrew D. Hurwitz recused himself from this case. Judge Cecil B. Patterson, Jr., of the Arizona Court of Appeals, Division One,