846 P.2d 850

**STATE of Arizona, Appellee,**

v.

**Robert RUELAS, Appellant.**

**No. 1 CA–CR 88–685.**

Court of Appeals of Arizona, Division 1, Department D.

Sept. 15, 1992.

As Corrected Oct. 27, 1992.

Review Denied March 16, 1993.

Grant Woods, Atty. Gen. by Paul J. McMurdie, Chief Counsel, Crim. Div., and Janet Keating, Asst. Atty. Gen., Phoenix, for appellee.

Dean W. Trebesch, Maricopa County Public Defender by Spencer D. Heffel, Deputy Public Defender, Phoenix, for appellant.

## OPINION

KLEINSCHMIDT, Judge.

This is an appeal from a conviction for manslaughter. This is the second time this case has been before us. The supreme court took review of our first opinion, *State v. Ruelas*, 165 Ariz. 326, 798 P.2d 1335 (App.1990), in which we affirmed the conviction. Without deciding the case, the supreme court remanded it to us to consider in light of the ruling of the Supreme Court of the United States in *Idaho v. Wright*, 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990), a case decided after we filed our opinion. In *Idaho v. Wright*, the Supreme Court explained the limitations that the confrontation clause of the sixth amendment to the Constitution of the United States places on the admission of hearsay evidence. We have reconsidered the case in light of *Idaho v. Wright*, and we find that the admission of hearsay statements made by the victim in this case did violate the confrontation clause. Accordingly, we reverse and remand.

The relevant facts are as follows. The defendant and a young woman, L, had known one another for several years. They had a son, and after the child was born they lived together with L's parents. In 1979, the defendant moved out, but continued to visit his son periodically. The defendant wanted to resume the relationship with L.

On November 22, 1980, L called the defendant to inform him that he could not take his son to the movie that night. Nevertheless, around 7:00 p.m., the defendant went to L's home. L, the child and the victim were there. The victim was a young man who had been seeing L for several months.

The defendant threatened the victim and tried without success to get him to go outside. The defendant left but returned twenty minutes later. He apologized to the victim and then stayed and talked with L for a few minutes before leaving. The defendant returned about 1:00 a.m. and entered the house. He asked to speak to L, but her mother told the defendant to leave. He went outside and sat on the hood of his car.

Several minutes later, the victim left the house to return to his home. The defendant called the victim over to where he was sitting, and they began talking. A fight broke out between them. L's mother heard the fighting and she began yelling at the defendant to go home. L heard her mother and went outside with the mother following. L testified that she saw the two men scuffling and she stepped between them. She said the victim kept backing away and that she, L, kept trying to push the defendant away. She saw the defendant's arm go past her and strike the victim twice. She turned around and saw that the victim was bleeding and holding his stomach. The mother testified that she did not see any of the fighting. The defendant stayed at the scene for a short time and then left.

The victim suffered a deep puncture wound. He was taken to the hospital for treatment. About an hour and a half after the stabbing, a Phoenix police officer questioned the victim about the incident. The victim said that the defendant had stabbed him and that he wanted to prosecute. The officer testified that the victim was alert and awake, but that he was in considerable pain and was having some trouble breathing.

The following day, about thirty six hours after the stabbing, a Phoenix police detective questioned the victim again. The victim was in bed with numerous plastic tubes attached to his body. The doctor limited the detective to a one-minute visit with the victim. The victim told the detective that the defendant picked up a knife that was on the ground by a palm tree and that he, the victim, was acting in self-defense when he punched the defendant in the face. About four months after the incident, the victim died from his wounds.

The defendant testified at trial. His version of the events was quite different from the state's evidence. He stated that when he went to L's house after midnight and L's mother told him to leave, he went outside and sat on the hood of his car. A few minutes later, the victim came outside and the defendant asked him to come over to where he was sitting so they could talk. After talking for a short time, the defendant stated that the victim bent over and lifted up his pant leg. The defendant thought he saw a knife so he jumped off the hood and kicked the victim in the chest. The defendant saw a knife on the ground and he picked it up. As he was standing up, the victim punched him in the face. The defendant moved away from the victim, out into the street. The victim came at him again, and the defendant "just swang" and then they separated. The defendant did not remember hitting the victim with the knife. He saw blood on the victim's right side. At that point he noticed L. The defendant said that he told the victim he was sorry and would take him to the hospital, but L told the defendant to leave.

The defendant was tried on a charge of second-degree murder. Over the defendant's objection, the court admitted the statements that the victim had made to the police officers. The defendant was convicted of the lesser included offense of manslaughter and sentenced to prison.

■ The confrontation clause guarantees criminal defendants the right to confront their accusers. U.S. Const. amend. VI; *State v. Robinson*, 153 Ariz. 191, 203, 735 P.2d 801, 813 (1987). Considerations of public policy override the confrontation

clause if two conditions are met: (1) the declarant must be unavailable, and (2) the declarant's statement must bear adequate "indicia of reliability." *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980).

■ Since the declarant was dead at the time of trial, the issue we must decide is whether the hearsay statements satisfy the second condition. The "indicia of reliability" requirement can be satisfied in one of two ways. The statement is admissible if (1) it falls within a "firmly rooted" hearsay exception, or (2) it is supported by a "showing of particularized guarantees of trustworthiness." *Id.*

■ Particularized guarantees of trustworthiness can be shown from the totality of the circumstances, but the relevant circumstances include only those that surround the making of the statement and that render the declarant particularly worthy of belief. *Wright,* 497 U.S. at 813, 110 S.Ct. at 3145. The evidence must be admissible by virtue of its inherent trustworthiness, and the other evidence in the case that points to the defendant's guilt is immaterial to this consideration. *Id.* There is no mechanical test for determining "particularized guarantees of trustworthiness." *Id.* Rather, trial courts can weigh such things as spontaneity, consistent repetition, the mental state of the declarant, and lack of a motive to fabricate in arriving at a decision on this point. *Id.*

In our original opinion, we found that the statements were admissible under the residual exception to the hearsay rule. In doing so, we relied heavily on the strength of the evidence against the defendant that had nothing to do with the inherent trustworthiness of the hearsay statements. Since this is impermissible under *Idaho v. Wright,* our original opinion must be vacated.

## THE FIRST STATEMENT WAS NOT ADMISSIBLE

Before we address the admissibility of the victim's first statement, we observe that in our opinion, the admission of this statement neither helped the prosecution very much nor particularly harmed the defense. The gist of the statement is simply that the defendant is the one who stabbed the victim, an element that the state easily proved through the testimony of L. Since this matter may be retried, we will address the admissibility of the first statement in the event the state seeks its admission again. The statement was a conversation between the alleged victim and a policeman in the emergency room approximately an hour and a half after the stabbing. The police officer testified as follows:

Q. [By Ms. Davis] Go ahead, Sergeant Gibbs. What did you ask him?

A. I asked [the victim] who had stabbed him.

Q. What did he tell you?

A. He told me that Robert Ruelas had.

Q. What were his—

A. His exact words were, "Robert Ruelas, and I will prosecute."

Q. What did you ask him next?

A. Next I asked him why he was stabbed, and he stated that Robert had stabbed him because "he wanted me to stop seeing [L]."

Q. What did you ask him next?

A. I asked him, "What did he stab you with," and he replied, "A lettuce knife."

Q. What did you ask him next?

A. I asked him, "What did he do with the knife after he stabbed you," and he replied, "He threw it into his car."

Q. What did you ask him next?

A. I asked him, "What kind of car does he have," and he said, "A '67 or a '69 blue Impala four-door." ·

The trial court found that the victim's statement could be admitted as an excited utterance, or a statement made under belief of impending death, or as an otherwise trustworthy statement under the residual exception of Rule 804, Arizona Rules of Evidence.

## A. EXCITED UTTERANCE

■ To qualify as an excited utterance under Rule 803(2), hearsay statements must meet three requirements:

1. There must be a startling event.
2. The words spoken must be spoken soon after the event so that the declarant will not have time to fabricate the declarations.
3. The words spoken must relate to the startling event.

*State v. Ritchey*, 107 Ariz. 552, 555, 490 P.2d 558, 561 (1971) (citing 6 Wigmore on Evidence § 1750 (3d ed.)). The exception relies on the assumption that "the excitement of certain startling events stills the reflective faculties," and therefore increases the likelihood of reliability and truthfulness. *State v. Rivera*, 139 Ariz. 409, 411, 678 P.2d 1373, 1375 (1984).

■ The question here is whether the words were spoken soon enough after the event so that the victim did not have time for reflection that could lead to fabrication, or whether the statement was otherwise made under circumstances that would indicate that it was not the product of reflection. In this regard, time limits are not fixed. *Id.* However, "[a]s the time interval increases, spontaneity decreases, the chance for reflection increases and so does the reluctance of the courts to find the statement admissible." *Id.* (citing McCormick, Evidence § 297 at 706 (2d ed. 1972)).

■ The victim's first statement was made an hour and a half after the stabbing and was not spontaneous. The state argues that a statement constitutes an excited utterance even if made in response to police questioning, provided that the declarant was still under the effect of the startling event. It is true that a statement is not necessarily inadmissible as an excited utterance merely because it is made in response to a question. *State v. Whitney*, 159 Ariz. 476, 483, 768 P.2d 638, 645 (1989). However, the Arizona cases which have allowed the admission of statements made in response to questions have features that are not present in this case. For example, in *Whitney*, the hearsay statements were admissible as excited utterances because the declarants were so excited that they were all talking at once, and the officer had to separate them and ask questions so he could understand what they were saying. *Id.* In *State v. Crivellone*, 138 Ariz. 437, 675 P.2d 697 (1983), the victim's hearsay statement was made in response to police questions at the scene of the shooting, shortly after it occurred. The victim was in shock and had to respond by nodding his head and using hand signals. The supreme court found that the victim was certainly under "the stress of excitement." *Id.* at 441, 675 P.2d at 701. In *State v. Anaya*, 165 Ariz. 535, 799 P.2d 876 (App.1990), the victim was assaulted by her husband in their home. The victim left the house and called the police, leaving two small children at home who were asleep. When the police arrived at the home, the husband refused to leave and he kept one of the children inside the house with him. The victim talked with a police officer about four hours after the assault. At that time, the standoff had not ended. The victim was still distraught and "worried sick" about her child. Her statement to the officer about what had happened that night was admissible as an excited utterance. *Id.* at 539, 799 P.2d at 881. In *State v. Barnes*, 124 Ariz. 586, 606 P.2d 802 (1980), the statement was made in answer to a policeman's question about twenty minutes after the assault. The victim who made the statement was sluggish and disoriented.

Other cases stress the importance of the excitement factor in the admissibility of the statement. *See State v. Yslas*, 139 Ariz. 60, 65, 676 P.2d 1118, 1123 (1984) (hearsay statement admissible as excited utterance where declarant was excited, "worked up," and anxious); *State v. Jeffers*, 135 Ariz. 404, 420, 661 P.2d 1105, 1121 (1983) (declarant appeared to be very excited and was difficult to understand).

In the present case, the police officer testified that when he talked with the victim in the emergency room after the stabbing, the victim was alert and awake, but appeared to be in considerable pain. There was no other evidence offered to show the mental state of the victim. Nothing in the

record indicates that the victim was nervous, excited, or in shock. The victim had had an hour and a half to contemplate the events surrounding the stabbing and he told the policeman that he wanted to prosecute the defendant. Based on the existing record, the first statement was not admissible as an excited utterance.

## B. DYING DECLARATION

■ The trial court indicated that the victim's first statement was admissible under Rule 804(b)(2), Arizona Rules of Evidence, as a statement made under belief of impending death. The rule requires that (1) the statement be offered in a homicide case, (2) the statement be made by a declarant while believing death to be imminent, and (3) the statement must concern the cause or circumstances of what the declarant believed to be his impending death. *State v. Adamson*, 136 Ariz. 250, 254, 665 P.2d 972, 976 (1983).

■ The defendant argues that the declarant did not make the statement while believing his death was imminent. We agree that the evidence is not sufficient to conclude that such was the case. A party offering the hearsay evidence can show a sense of impending death either by express language or by circumstances which compel the conclusion that the declarant believed he was dying. *Id.* In this case the state has shown neither. The victim never said he thought he was dying, and we cannot say that the circumstances surrounding the statement unquestionably indicated that the victim thought he was going to die. Based on the existing record, the statement was not admissible under Rule 804(b)(2).

Since the question of whether the first statement was admissible under the residual exception of Rule 804(b)(5) is closely tied to our discussion of "indicia of reliability" as that concept applies to the second hearsay statement, we will defer for the moment further consideration of the admissibility of the first statement. We turn to whether the second statement was admissible.

## THE SECOND STATEMENT WAS NOT ADMISSIBLE

■ The second hearsay statement admitted at trial was a conversation between the victim and a police detective which took place at the hospital approximately thirty-six hours after the stabbing. The trial court found the statement admissible under the residual exception in Rule 804(b)(5), Arizona Rules of Evidence. That is the only ground for its admission that the state urges on appeal. The detective was allowed to testify as follows:

Q. [By Ms. Davis] Detective Havelin, what did you ask [the victim]?

A. Well, the first question I asked him was, "Who stabbed you?" And he replied "Robert Ruelas."

Q. What else did you ask him?

A. I told him to tell me exactly what happened on the night of the stabbing. He stated he left [L's mother's] house, which is the house that [L] lived in, and he was walking outside to go to his apartment and he observed Robert standing by a palm tree.

At the palm tree, at the base of the palm tree was a large knife, and Robert said to the victim, he says, I want you—"Come on over here." The victim said, [the victim] said that he's not coming over there with him armed with a large knife.

. . . .

Q. Now, what did [the victim] specifically tell you he told Robert?

A. His exact words were, "I'm not going anywhere near you with that knife."

Q. What did he say happened next?

A. Robert then said, "I'm not going to hurt you."

Q. Excuse me, Detective. Did he tell you that Robert did anything before he made another statement?

A. He said that Robert then laid the knife down on the ground near the palm tree.

Q. Then did Robert tell him anything?

A. Then Robert said to him, "I'm not going to hurt you. Let's talk this thing over."

Q. What happened next?

A. Then the victim, [the victim], said he approached Robert to talk, and as he got close to him he saw Robert pick up, reach down and pick up the knife and come towards him.

Q. What did [the victim] do, or what did he tell you he did?

A. He said that Robert told him as he was coming towards him with the knife, "I'm going to give you what's coming to you."

Q. What happened next?

A. [The victim] said he then in self-defense punched Robert twice in the face with his fist.

Q. Where was the knife at the point in time when he punched Robert?

A. He didn't say. He didn't tell me.

Q. Did he tell you, though, after, that Robert made any actions after he said "I'm going to give you what's coming to you"?

A. He just came at him with the knife, and then he was punched by the victim.

Q. You indicate in your report that he said that the suspect raised the knife after he made the statement. Is that what [the victim] told you?

A. Yes.

Q. After the victim punched Mr. Ruelas, what happened to [the victim]?

A. [The victim] said that he was then stabbed.

Q. What did [the victim] say he did next?

A. Pardon me?

Q. What did [the victim] say that he did after he was stabbed?

A. He said at that time when he was stabbed, he then kicked Robert in the groin with his feet.

Q. And then what happened next?

A. Then he was stabbed a second time.

Q. Did you ever show [the victim] any photographs?

A. Yes, I did.

Q. Did he have any difficulty in picking out Mr. Ruelas?

A. No, he didn't.

Q. Did he indicate to you how long he had known him?

A. He stated he was introduced to Robert at [L's mother's] house and he had known him for three weeks, because he used to visit the house quite often and he had seen Robert there many times.

There is no contention that the second statement is admissible as a firmly rooted exception to the hearsay rule. In *Wright*, the Supreme Court observed that the residual exception under the Idaho Rules of Evidence is not a firmly rooted hearsay exception for purposes of the confrontation clause. *Id.* at 812. The residual exception under the Arizona Rules of Evidence is identical to Idaho's. Thus, in the context of the confrontation clause, the hearsay statements in the present case are presumptively unreliable and inadmissible, and "must be excluded, at least absent a showing of particularized guarantees of trustworthiness." *Id.* at 813.

We find that the state did not meet its burden of overcoming the presumption that either the first or second hearsay statement was unreliable and inadmissible. Here, the victim had an hour and a half in one instance, and a day and a half in the other, to reflect on the incident. He may well have had a reason to fabricate. He might have believed that he himself was in trouble for participating in the affray. More important, the defendant and the victim were rivals for the affection of the same woman, and the rivalry would naturally have caused animosity between them.

The state urges that the fact that the victim had been in surgery and was in pain when he made the statement is a sufficient particularized guarantee of trustworthiness to allow the admission of the statement. We believe that something more is required, particularly in view of the rivalry between the victim and the defendant.

## THE ERROR WAS NOT HARMLESS

■ The state argues that even if the defendant's right of confrontation was violated by the admission of either hearsay statement, such error was harmless beyond a reasonable doubt. The test for prejudicial error is whether the appellate court can say, beyond a reasonable doubt, that the jury would have found the defendant guilty without the evidence. *State v. Wilhite*, 160 Ariz. 228, 233, 772 P.2d 582, 587 (App. 1989).

■ In support of its argument that any error in the admission of the statements was harmless, the state points to L's testimony which indicates that at the time of the stabbing, the defendant was the aggressor. While we recognize this as strong evidence in refutation of the defendant's version of events, it is not the kind of objective evidence that can be viewed as overwhelming. Without the hearsay statements of the victim, the case boils down to a conflict between what the defendant and L say happened. We cannot say beyond a reasonable doubt that the jury would have convicted the defendant of manslaughter if the hearsay statements had not been admitted. *See State v. Thompson*, 169 Ariz. 471, 820 P.2d 335 (App.1991); *State v. Tucker*, 165 Ariz. 340, 798 P.2d 1349 (App.1990).

The opinion previously filed in this case is vacated. The judgement of conviction and sentence imposed are vacated, and this matter is remanded to the trial court for further proceedings.

GRANT, P.J., and CLABORNE, J., concur.