116 P.3d 631

**STATE of Arizona, Appellee,**

v.

**David Patrick PARKS, Appellant.**

**No. 1 CA–CR 03–0573.**

Court of Appeals of Arizona, Division 1, Department D.

Aug. 4, 2005.

As Amended Aug. 26, 2005.

Review Granted Nov. 29, 2005.

---

Terry Goddard, Attorney General, by Randall M. Howe, Chief Counsel, Criminal Appeals Section, Phoenix, Attorneys for Appellee.

James Haas, Maricopa County Public Defender, by Spencer D. Heffel, Deputy Public Defender, Phoenix, Attorneys for Appellant.

## OPINION

NORRIS, Judge.

¶1 David Patrick Parks was convicted of manslaughter in the shooting death of Neal Pluguez. Parks' son, Cory, witnessed the shooting. Cory died in an automobile accident before trial. Over objection, the trial court allowed the State to introduce into evidence at trial statements made by Cory to a sheriff's deputy at the crime scene under the "excited utterance" exception to the hearsay rule.

¶2 The dispositive issue in this appeal is whether admission of Cory's out-of-court statements as excited utterances complied with the Sixth Amendment guarantee that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him...." As recently recognized by the United States Supreme Court, the Sixth Amendment bars the admission of "testimonial" out-of-court statements by unavailable declarants at a criminal trial unless the defendant had a prior opportunity to cross-examine the declarant. *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). We hold Cory's statements to the deputy at the crime scene were the product of a police interrogation and testimonial under *Crawford*. Because Parks had not received a prior opportunity to cross-examine Cory, the statements should not have been admitted into evidence. We thus reverse Parks' conviction and remand for a new trial.

### FACTS AND PROCEDURAL BACKGROUND

*I. The Roadway Dispute*

¶3 Parks and Pluguez lived on adjoining properties. On the east side of Parks' property was 220th Avenue and on the west was the property occupied by Pluguez. On the eastern edge of, but within the Pluguez property, was a dirt roadway. Both 220th Avenue and the roadway ran north to a paved, main road. Although Parks could access his property using 220th Avenue, he believed the dirt roadway was a public road even though it was within the Pluguez property. Consequently, over Pluguez' objections, Parks and his family used the roadway to access their property.

¶4 The dispute between Parks and Pluguez over the roadway escalated throughout 2002. In March, Pluguez exchanged angry words with Parks over Parks' use of the roadway and told him not to use it.

¶5 After another angry encounter between the two men in April, Parks tore down part of a chain link fence the Pluguez family had erected along the eastern side of the roadway to block Parks' access to it. Two months later, the Pluguez family again attempted to stop Parks and his family from using the roadway by installing several 5,000 pound

concrete highway barriers on the property line. The barriers blocked Parks from using a pedestrian gate and an "RV" gate in a fence Parks had erected on his property. The barriers remained in place until early September when Parks moved several of them so he could work on his fence and build a dog pen on his property.

## II. The Shooting

¶ 6 On September 14, 2002, Parks, Cory, and Parks' brother, Harold, began working on the dog pen. Parks was armed with a handgun ostensibly to defend against snakes. Parks decided to place a discarded telephone pole next to one side of the dog pen to keep his dogs from digging under it. He used a chain on the back of an old pickup truck to maneuver the pole into place. Parks left the truck on the roadway when he, Harold and Cory broke for lunch around noon.

¶ 7 Shortly thereafter, Parks saw Pluguez walk toward the truck, and then walk around it. Parks told Pluguez to stay away from his truck. Pluguez told Parks the land was his and Parks and his truck were not supposed to be on it. The two men argued. Pluguez then walked away, and Harold told Parks he should move his truck because "we don't need anymore trouble."

¶ 8 Parks went to the truck to move it. He saw Pluguez walking back carrying what appeared to be a large car part. Parks entered the truck and started it. According to Harold, who was approximately 45 yards away from the scene, as Pluguez approached the truck, he lifted the part over his head. Harold heard Parks say, "[y]ou better not, you better not." Pluguez then threw or dropped the part on the hood of the truck and Harold heard the truck's motor stall. Parks jumped out of the truck. Harold heard Pluguez say, "[w]hat are you going to do, what are you going to do?" Pluguez continued to walk toward Parks. Parks pulled out his gun and started to back up. As Pluguez advanced, Parks fired one or perhaps two—the evidence is unclear—shots into the ground. Pluguez continued to advance and Parks fired again. According to Harold, Parks was holding the gun with his elbow above his shoulder, but shooting at the

ground. Pluguez turned around, started to walk away, and then fell to the ground. Parks had shot Pluguez in the chest.

¶ 9 Harold went over to Pluguez but could feel no pulse. Cory, who had been digging in the yard approximately 25 yards from the truck, also saw the shooting. Cory ran to the house to fetch a phone. Harold telephoned 9-1-1 and told the 9-1-1 operator Parks had shot a neighbor. Pluguez died before the paramedics and sheriff deputies arrived.

## III. The Sheriff's Investigation

¶ 10 On their arrival, sheriff's deputies put Parks "at gunpoint and instructed him to go to his knees" and then to a prone position. They handcuffed, searched and arrested Parks and secured him in the back of a squad car. Cory and his sister were outside of the house, and the deputies heard them yelling their "dad was just defending himself." Deputy Sheriff Robert Manor arrived at around 12:55 p.m., approximately 25 minutes after the shooting. The lead deputy at the scene asked Manor to interview Harold and Cory. Manor asked Harold and Cory if they had seen what had happened. They told Manor they had witnessed the shooting.

¶ 11 After separating the two, Manor questioned Harold for approximately 15 to 20 minutes. Manor then questioned Cory for about 15 to 20 minutes. At trial, Manor testified Cory seemed to be "somewhat excited and talking quickly." Cory told Manor that he had been digging in the middle of the yard when he noticed Pluguez walking from his property "up" the roadway toward the Parks' property. Pluguez walked past the truck and then looked into its bed and interior. His father asked Pluguez what he was doing and in response Pluguez started swearing and asking why the Parks' truck was parked on his property. The two men argued. As Pluguez started to walk toward his property, he picked up a generator or compressor, turned around and began walking back toward the truck. Cory heard his father say "[y]ou better not drop that, you better not throw that at my truck."

¶ 12 When Pluguez was about ten feet from the truck, his father got in the truck to move it. He started the truck and just as it started to move, the motor stalled. As the truck stalled, Pluguez threw the compressor on the hood of the truck. Parks got out of the truck and said something to Pluguez— Cory could not hear what. Parks took a step back as Pluguez advanced toward him. Parks removed his gun from his holster and shot, pointing the gun at a "downward angle." Pluguez continued to walk toward Parks, and Parks shot again. After the last shot, Pluguez turned around and started walking toward his property, but then fell to the ground.

¶ 13 After Manor finished questioning Cory, he told Cory and Harold "they needed to stay separated from each other until Homicide Detectives could interview the two of them again." Sheriff's deputies subsequently drove Cory to a sheriff's station. At approximately 5:46 p.m., a homicide detective, Gary McGuire, interviewed Cory. The interview was videotaped.

¶ 14 Cory's statements to Detective McGuire about the shooting generally tracked what he had told Deputy Manor at the crime scene, except Cory was able to recall his father had said "[w]hat are you doing?" to Pluguez after the truck had stalled. Cory repeated Parks had been in the truck when Pluguez threw the car part at the hood of the truck and Parks had then jumped out of the truck after it had stalled. Cory said his father had stepped back after jumping out of the truck; Pluguez had continued to walk forward; and his father had shot "somewhere like two or three times." Cory demonstrated to McGuire how Parks was holding the gun. After Pluguez fell to the ground, Cory ran into the house to find a telephone and a towel, and put the towel on Pluguez' back for the blood. He tried to check Pluguez' pulse, but "was shaky [and] couldn't really tell." Cory also said he and his father had turned Pluguez over "to get his face out of the dirt."

¶ 15 Parks was ultimately charged with second degree murder. He pleaded not guilty and claimed he had shot Pluguez in self defense.

*IV. Motion to Suppress Cory's Out–of–Court Statements*

¶ 16 Six months before trial, Cory died in an automobile accident. The State notified the court and counsel it intended to introduce Cory's statements to Manor and his taped interview with McGuire at trial. Parks moved to bar the State from introducing Cory's statements, asserting they constituted inadmissible hearsay and their admission would violate his Sixth Amendment right to confront the witnesses against him.

¶ 17 The court held an evidentiary hearing on Parks' motion. Deputy Manor testified. The State introduced into evidence McGuire's videotaped interview of Cory; Manor's written report summarizing his interview of Harold and Cory at the scene; a report prepared by another deputy who had taken Parks into custody; and a report prepared by a third deputy who had interviewed a not quite 14–year–old friend of Cory's who lived a house or two away. Cory's friend told the deputy that shortly after the shooting, Cory had telephoned

> asking to speak with her Uncle who wasn't there. She asked CORY if he was all right and CORY told her, "no." She asked him what was wrong and CORY stated his dad had just killed a Mexican man in front of him.
>
> [She] continued to ask CORY if he was all right, but he said "not really." His voice sounded funny to her and she thought, he might have been crying. [She] said the conversation ended, and she began to worry about CORY.

¶ 18 The court found Cory's statements at the crime scene were admissible pursuant to the "excited utterance" exception to the hearsay rule. Under Arizona Rules of Evidence 803(2), an excited utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." The trial court found Cory had witnessed "a very startling event. The boy had just witnessed his father shoot and apparently kill a man right in front of him," and was under the stress of that event when

questioned approximately 50 minutes after the shooting. In making this finding, the court relied on Cory's friend's description of her telephone call with Cory.

¶ 19 The court ruled Cory's videotaped interview with McGuire was also admissible, but under a different exception to the hearsay rule—the "catchall" or residual exception for unavailable witnesses. Under this exception, hearsay evidence may be admitted if, in addition to other requirements, it possesses adequate circumstantial guarantees of trustworthiness, is offered as evidence of a material fact, and its admission would best serve the interests of justice. Ariz. R. Evid. 804(b)(5). The court found that what Cory said about the shooting was unusually reliable because he had "no motive to say anything negative about his own father" and it was consistent with what he had told Manor.

## V. The Trial

¶ 20 In its case-in-chief, the State called Harold and Deputy Manor. Harold testified Parks was in the truck when Pluguez had dropped or thrown the compressor and when Parks had fired the gun he had been shooting at the ground with his elbow in the air above his shoulder. Over Parks' objection, Manor told the jury what Cory had told him at the crime scene. The State also played Cory's videotaped interview.

¶ 21 Parks testified in his own defense. Contradicting Harold and Cory, Parks testified that when he jumped out of the truck after it had stalled, Pluguez still had the compressor in his hands and, as he was advancing toward Parks, Pluguez raised it from his chest to head level as if to throw it at him. Parks was terrified as he thought Pluguez was going to hit him with the compressor. Parks' recollection of the height at which he held the gun differed from what Cory had demonstrated on the videotape but was consistent with Harold's testimony. Parks testified he had held the gun at a downward angle about "nose to neck level."

¶ 22 The jury found Parks guilty of the lesser included offense of manslaughter. Parks was sentenced to an aggravated term of 18 years imprisonment. Parks timely appealed his conviction and sentence.

## DISCUSSION

■ ¶ 23 Parks argues admission of Cory's out-of-court hearsay statements to Manor and his videotaped interview with McGuire violated his rights under the Confrontation Clause of the Sixth Amendment. Although we review a trial court's ruling on the admissibility of evidence under exceptions to the hearsay rule for abuse of discretion, we review a trial court's determination of a Confrontation Clause violation de novo. *State v. Bronson*, 204 Ariz. 321, 324, ¶ 14, 63 P.3d 1058, 1061 (App.2003).

## I. The Confrontation Clause, Hearsay and Crawford

■ ¶ 24 The Sixth Amendment to the Constitution provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him...." The Arizona Constitution also guarantees a defendant's right to confront the witnesses against him. Ariz. Const. art. 2, § 24. Even if the Arizona Constitution contained no such guarantee, the United States Supreme Court has long recognized that this "bedrock procedural guarantee" applies to both federal and state prosecutions. *Crawford*, 541 U.S. at 42, 124 S.Ct. 1354 (citing *Pointer v. Texas*, 380 U.S. 400, 406, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965)).

¶ 25 If read literally, the Confrontation Clause would require the exclusion at trial of any out-of-court statement made by an absent declarant. The Supreme Court, however, has never applied the Confrontation Clause literally. Until recently, hearsay was admissible in a criminal trial if the declarant was unavailable and the statement bore adequate indicia of reliability. *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). Adequate indicia of reliability existed if the statement fell within a "firmly rooted" hearsay exception or if it bore "particularized guarantees of trustworthiness." *Id.* at 66, 100 S.Ct. 2531. Arizona followed the *Roberts* test. *E.g., State v. Prasertphong*, 206 Ariz. 70, 81, ¶ 35, 75 P.3d 675, 686 (2003), *vacated*

*by* 541 U.S. 1039, 124 S.Ct. 2165, 158 L.Ed.2d 727 (2004).

¶ 26 The reliability analysis adopted in *Roberts* was recently jettisoned by the Supreme Court in *Crawford.* In *Crawford,* the Court analyzed the historical background of the Confrontation Clause to determine the meaning of an accused's right to confront the "witnesses against him." 541 U.S. at 47–50, 124 S.Ct. 1354. From this history, the Court drew two inferences about the meaning of the Clause.

¶ 27 The Court first inferred that the "principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly the use of *ex parte* examinations as evidence against the accused." *Id.* at 50, 124 S.Ct. 1354. Accordingly, the Court rejected the view that the Clause applied only to in-court testimony, and its application to out-of-court statements introduced at trial depended on the law of evidence. "Leaving the regulation of out-of-court statements to the law of evidence would render the Confrontation Clause powerless to prevent even the most flagrant inquisitorial practices." *Id.* at 51, 124 S.Ct. 1354. The Court recognized, however, that not all hearsay "implicates" the Sixth Amendment's core concerns, and that the text of the Confrontation Clause reflected "an especially acute concern with a specific type of out-of-court-statement." *Id.* The Court explained:

> The text of the Confrontation Clause reflects this focus. It applies to "witnesses" against the accused—in other words, those who "bear testimony." "Testimony," in turn, is typically "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not. The constitutional text, like the history underlying the common-law right of confrontation, thus reflects an especially acute concern with a specific type of out-of-court statement.

*Id.* (internal citations omitted).

¶ 28 The Supreme Court did not, however, provide a comprehensive definition of the core class of "testimonial" statements. Instead, it described "various formulations" testimonial statements could take. These included: *ex parte* in-court testimony or its fundamental equivalent, "such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially[;]" "formalized testimonial materials," such as "depositions, prior testimony, or confessions[;]" statements made under "circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial[;]" and, "[s]tatements taken by police officers in the course of interrogations...." *Id.* at 51–52, 124 S.Ct. 1354.

¶ 29 The Court next inferred that the framers would "not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Id.* at 53–54, 124 S.Ct. 1354. The court read the historical sources as suggesting that having a prior opportunity to cross-examine an adverse witness was a dispositive requirement, not simply one way to establish reliability of the out-of-court statement. *Id.* at 55–56, 124 S.Ct. 1354. From this, the court concluded the right to confront one's accusers was not a substantive guarantee that could be satisfied by other means of insuring the reliability of an accuser's statements, but was a procedural guarantee commanding "not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." *Id.* at 61, 124 S.Ct. 1354.

¶ 30 Under *Crawford,* where "testimonial evidence is at issue ... the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Id.* at 68, 124 S.Ct. 1354. Thus, when a witness makes a testimonial statement against the accused, the accused has a constitutional right to confront that witness. A testimonial statement may not be admitted at trial unless the declarant is unavailable and the accused received a prior opportunity to cross-examine the witness.

*II. Application of Crawford to Cory's Statements to Manor*

## A. Excited Utterances are Subject to Crawford

¶ 31 Parks argues Cory's statements to Manor, found by the trial court to be excited utterances, were testimonial under *Crawford* and should not have been admitted at trial. The State disagrees. It asserts that because an excited utterance is a spontaneous natural response to a startling event it can never be—as *Crawford* characterized—"a solemn declaration or affirmation made for the purpose of establishing or proving some fact" or a statement the declarant "would reasonably expect to be used prosecutorially." 541 U.S. at 51, 124 S.Ct. 1354. The solemnity required for a testimonial statement under *Crawford*, the State reasons, conflicts with the underlying rationale for the excited utterance exception to the hearsay rule—that a spontaneous statement about a startling event made by a witness to the event is less likely to be fabricated or contrived. *State v. Rivera*, 139 Ariz. 409, 411, 678 P.2d 1373, 1375 (1984).

¶ 32 In the aftermath of *Crawford*, many courts have adopted the categorical position the State takes here, and have concluded that there is an inherent contradiction in characterizing an excited utterance as testimonial. *See Anderson v. State*, 111 P.3d 350, 354–55 (Alaska Ct.App.2005) (citing cases); *People v. Corella*, 122 Cal.App.4th 461, 18 Cal.Rptr.3d 770, 776 (2004); *State v. Wright*, 686 N.W.2d 295, 302 (Minn.Ct.App.2004). Several of these courts relied on *Hammon v. State*, 809 N.E.2d 945 (Ind.Ct.App.2004), *vacated by* 829 N.E.2d 444 (Ind.2005).

¶ 33 In *Hammon*, police responded to what turned out to be a domestic violence call. *Id.* at 947–48. They questioned the victim and the assailant at the scene to determine what had happened. *Id.* The court held the victim's statements were excited utterances and, thus, non-testimonial. *Id.* at 948–52. The court explained that the "very concept of an 'excited utterance' [was] such that it [was] difficult to perceive how such a statement could ever be 'testimonial.' ... An unrehearsed statement made without time for reflection or deliberation, as required to be

an 'excited utterance,' is not 'testimonial' in that such a statement, by definition, has not been made in contemplation of its use in a future trial." *Id.* at 952–53.

¶ 34 The Indiana Supreme Court recently vacated the lower appellate court's decision, however, holding there was no inherent contradiction in characterizing an excited utterance as testimonial. *Hammon v. State*, 829 N.E.2d 444, 453 (Ind.2005). In vacating *Hammon*, the Indiana Supreme Court followed the reasoning other courts have adopted in rejecting the view that an excited utterance can never be testimonial. Illustrative is *Lopez v. State*, 888 So.2d 693, 700–01 (Fla.Dist.Ct.App.2004). There, police responded to a report of a kidnapping and assault. *Id.* at 695. They asked the victim what had happened. *Id.* The victim told them he had been abducted in his own car at gunpoint. *Id.* The victim pointed to the defendant who was standing several yards away, and then told the police the defendant had left the gun in the car. *Id.* The police searched the victim's car and found a loaded gun belonging to the defendant under the front passenger seat. *Id.* The court held that the victim's excited utterances to the police were not automatically non-testimonial:

> In our view, the findings necessary to support a conclusion that a statement was an excited utterance do not conflict with those that are necessary to support a conclusion that it was testimonial. A statement made in the excitement of a startling event is likely to be more reliable given the fact that the declarant had little time to make up a story. But, under *Crawford*, reliability has no bearing on the question of whether a statement was testimonial. Some testimonial statements are reliable and others are not.

*Id.* at 699. To the same effect see *State v. Hembertt*, 269 Neb. 840, 696 N.W.2d 473, 482 (2005); *Stancil v. U.S.*, 866 A.2d 799, 809 (D.C.Ct.App.2005), *reh'g granted en banc*, 878 A.2d 1186, 2005 WL 1653880 (D.C. June 29, 2005).

¶ 35 We agree with the reasoning in *Lopez* and reject the State's position that an excited utterance can never be testimonial

in the *Crawford* sense. The excited utterance exception rests on the belief that a statement, made under the stress of and about a startling event, "may be taken as expressing the real belief of the speaker as to the facts just observed by him." *Keefe v. State*, 50 Ariz. 293, 298, 72 P.2d 425, 427 (1937). That the speaker is excited does not necessarily strip what is said ("the real belief of the speaker") of its testimonial significance, that is, its force to establish or prove a fact against the accused.

¶ 36 Further, a statement may be testimonial under *Crawford* if the declarant would reasonably expect it to be used prosecutorially or if it was made under circumstances that would lead an objective witness reasonably to believe the statement would be available for use at a later trial. Although an excited utterance must be spontaneous, that is, made before a declarant has time to fabricate, true immediacy is not required. *See State v. Ruelas*, 174 Ariz. 37, 41, 846 P.2d 850, 854 (App.1992). Arizona courts have consistently found the physical and emotional condition of the declarant at the time of the statement to affect spontaneity more than the time between the statement and the event. *State v. Anaya*, 165 Ariz. 535, 538–39, 799 P.2d 876, 879–80 (App.1990). While a declarant's emotional state may "still" reflection, *Keefe*, 50 Ariz. at 297–98, 72 P.2d at 427, such a declarant may nevertheless reasonably appreciate or expect that his statement will have an impact on whether an arrest is made, charges are brought or guilt is attributed.

¶ 37 In our view, *State v. Whitney*, 159 Ariz. 476, 768 P.2d 638 (1989), presents such a situation. There, three declarants ran up to a policeman, shouted "somebody may have possibly been raped" and told him they had been following the suspect. *Id.* at 479, 768 P.2d at 641. They gave the policeman a description of the suspect's vehicle and its license number. *Id.* Approximately 20 minutes later, they spoke to another policeman. They were excited, anxious and all talking at once. The police officer separated the three witnesses and spoke to them one at a time to find out what had happened. *Id.* The Arizona Supreme Court held the declarants' statements were admissible as excited utter-

ances even though they were made partially in response to questions by police officers. *Id.* at 483, 768 P.2d at 645. It is inconceivable to us that in speaking with the police, the declarants in *Whitney* would not have appreciated or expected the police to rely on their statements in investigating the crime and arresting the suspect. We agree with the court's observation in *Lopez*:

> [A] startled person who identifies a suspect in a statement made to a police officer at the scene of a crime surely knows that the statement is a form of accusation that will be used against the suspect. In this situation, the statement does not lose its character as a testimonial statement merely because the declarant was excited at the time it was made.

888 So.2d at 699–700.

¶ 38 Finally, the formulation of testimonial adopted in *Crawford* includes statements taken by police officers during an interrogation. As we discuss in more detail below, whether a statement falls within this formulation depends on the purpose of the statement, not on the emotional state of the declarant.

¶ 39 The facts of this case illustrate what we mean. The trial court found Cory had witnessed a startling event, and that his statements to Manor about the shooting were made under the stress of that event and were spontaneous. The trial court did not abuse its discretion in finding Cory's statements to Manor were excited utterances. Nevertheless, as we discuss below, Cory's statements had testimonial significance and were made during the course of a police interrogation.

¶ 40 Whether an excited utterance will be testimonial, thus, depends on the circumstances existing when the statement was made. In *State v. Aguilar*, 210 Ariz. 51, 107 P.3d 377 (App.2005), we essentially recognized this. There, we held that an excited utterance heard and testified to by a lay witness did not fit within *Crawford's* definition of testimonial. *Id.* at ¶ 1. In so holding, we examined cases from other jurisdictions that analyzed the applicability of *Crawford* to such an excited utterance. *Id.* at 53, ¶¶ 11–12, 107 P.3d at 379. We noted that these cases had found that *Crawford* was not applicable because the declarants had no reason

to expect their statements would be used in a prosecutorial manner. *Id.* We also noted that the statements had not been made to establish or prove a fact or in response to police questioning. *Id.* Although we did not decide the issue, we recognized *Crawford* might be implicated if the excited utterance was made in response to a "police officer's query." [1] *Id.* at 53, ¶ 12, 107 P.3d at 379.

¶ 41 Therefore, we disagree with the State's argument that an excited utterance can never be testimonial under *Crawford.* We concur with what the court recognized in *Lopez:* depending on the circumstances, some excited utterances will be testimonial, others will not.

### B. Cory's Statements to Manor were Obtained through a Police Interrogation

¶ 42 We thus turn to the issue *Crawford* requires us to decide: whether Cory's statements to Manor at the crime scene were testimonial. Parks argues they were, asserting Manor "was gathering evidence for the case against him." The State contends they were not because they were obtained in response to what the State characterizes as an informal, non-structured preliminary "field investigation." In describing Manor's questioning of Cory in these terms, the State attempts to position itself outside of the type of out-of-court testimonial hearsay statement *Crawford* held unquestionably violated the Confrontation Clause—a "recorded statement, knowingly given in response to structured police questioning...." [2] 541 U.S. at 53 n. 4, 124 S.Ct. 1354.

¶ 43 The State cannot, however, avoid what *Crawford* directs by attempting to limit its reach to the facts of the police interroga-

tion presented there. Just as the Supreme Court refused to provide a comprehensive definition of "testimonial," it also declined to give a comprehensive definition or description of what constituted a police interrogation. *Id.* The Court acknowledged it was using the term "interrogation" in its "colloquial, rather than any technical legal, sense" and various definitions of "interrogation" existed, but it identified no single definition, as the witness's statement at issue there qualified "under any conceivable definition." *Id.* Thus, whether an out-of-court statement is a product of a police interrogation is a factually driven inquiry and must be determined on a case-by-case basis.

¶ 44 As a consequence, just as courts have struggled with the meaning of testimonial post-*Crawford,* courts have grappled with the meaning of interrogation. Several courts have concluded that preliminary questions asked by police at the scene of a crime shortly after the crime do not amount to an interrogation because they are not sufficiently "formal" or "structured." *Hammon,* 809 N.E.2d at 952 (preliminary investigatory questions asked at scene of crime shortly after crime occurred is not an interrogation); *Corella,* 122 Cal.App.4th at 468, 18 Cal. Rptr.3d 770 (same); *Rogers v. State,* 814 N.E.2d 695, 701–02 (Ind.Ct.App.2004) (same), *abrogated by Hammon v. State,* 829 N.E.2d 444 (Ind.2005); *Wright,* 686 N.W.2d at 302, (expressing doubt that police response to incident when victims are in distress and police are primarily concerned with ensuring assailant has been apprehended satisfies any of the examples of testimonial hearsay provided in *Crawford* ).

¶ 45 Other courts have considered different factors, such as the audience to which the

---

1. *Aguilar* also noted an "excited declarant will not simultaneously be rationally anticipating that his utterance might be used at a future court proceeding." *Id.* at ¶ 10, 107 P.3d 377. We interpret this statement in the factual context in which it was made-where the excited utterance was heard and testified to by a lay witness. When an excited declarant speaks to a lay witness, the declarant may have no reason to anticipate that his statement might be used in a future

prosecution. We do not mean to suggest, however, that such a situation could never occur.

2. The "recorded statement" at issue in *Crawford* was a tape-recorded statement given to police by the defendant's wife describing the defendant's stabbing of the victim. 541 U.S. at 38, 124 S.Ct. 1354. As in the case before us, the prosecution wanted to introduce the tape-recorded statement to the police as evidence the stabbing was not in self-defense.

statement was made and whether the declarant or the police initiated the questioning. *Aguilar,* 210 Ariz. at 53, ¶ 11, 107 P.3d at 379 (excited utterance testified to by lay witness); *State v. Griffin,* 33 Cal.4th 536, 576–78, 15 Cal.Rptr.3d 743, 93 P.3d 344 (Cal.2004) (victim's statement to a friend at school was not testimonial within the meaning of *Crawford* ); *State v. Barnes,* 854 A.2d 208, 210–11 (Me. 2004) (statement not testimonial when, among other matters, victim went to police on her own); *People v. Moscat,* 3 Misc.3d 739, 777 N.Y.S.2d 875, 880 (N.Y.Crim.Ct. 2004) (victim initiated 9–1–1 call); *State v. Forrest,* 164 N.C.App. 272, 596 S.E.2d 22, 27 (2004) (statements made by victim to police after rescue from kidnapping and violent assault); *Wilson v. State,* 151 S.W.3d 694, 698 (Tex.App.2004) (witness initiated interaction with police not testimonial and not product of interrogation).

¶ 46 In our view, an interrogation, as that term is used in *Crawford,* does not turn on whether police questioning occurred during a field investigation or can be labeled formal or structured. Such a reading ignores that *Crawford* must be applied in a manner consistent with what it held were the core concerns implicated by the Sixth Amendment.

¶ 47 *Crawford* explained the Confrontation Clause was a response to a "principal evil"— the introduction at trial of accusatory or incriminating hearsay obtained through *ex parte* investigatory examinations conducted by judicial officers. 541 U.S. at 50, 124 S.Ct. 1354. *Crawford* recognized police interrogations raise this same Sixth Amendment concern because today police officers perform many of the investigative functions that, in 16th and 17th century England and colonial America, were handled by judicial officers. *Id.* at 53, 124 S.Ct. 1354.

That interrogators are police officers rather than magistrates does not change the picture either. Justices of the peace conducting examinations under the Marian statutes were not magistrates as we understand that office today, but had an essentially investigative and prosecutorial function. England did not have a professional police force until the 19th century ... so it is not surprising that other government officers performed the investigative functions now associated primarily with the police. The involvement of government officers in the production of testimonial evidence presents the same risk, whether the officers are police or justices of the peace.

*Id.* (internal citations omitted).

¶ 48 The historic underpinnings of the Confrontation Clause as analyzed in *Crawford* lead us to the following conclusions. First, not every police-citizen encounter will generate a testimonial statement because not every police-citizen encounter will be an interrogation. Statements made by witnesses to police so the police may secure their own or the witnesses' safety, render emergency aid, or protect the security of a crime scene may not be testimonial. Questioning incidental to other law enforcement objectives, for example, "exigent safety, security, and medical concerns" implicates core confrontation clause concerns less than does police questioning directed toward the production of evidence for use in a potential prosecution. *People v. Kilday,* 20 Cal.Rptr.3d 161, 172 (Cal.Ct.App.2004) (review granted Jan. 19, 2005). As explained by the court in *Stancil:*

"[p]olice who respond to emergency calls for help and ask preliminary questions to ascertain whether the victim, other civilians, or the police themselves are in danger, are not obtaining information for the purpose of making a case against a suspect." Statements made to officers at this initial stage of the encounter—one might fairly call it "securing the scene"—are not testimonial.... [H]owever ... "[i]n contrast, where police officers engage in structured questioning of victims or witnesses to a crime after the emergency has passed ... the resulting statements are more like the 'formal statement[s] to government officers' of concern in *Crawford.*"

866 A.2d at 812.

¶ 49 Second, an interrogation may occur even in the absence of "formal" or "structured" police questioning, concepts the State seems to suggest incorporate some type of prior planning or systematic organization. Questioning during a field investigation when there are no "exigent safety, secu-

rity, and medical concerns" that has as its objective the production of evidence or information for a possible prosecution, is within the core concerns of the Sixth Amendment just as is a formal witness interview at a station house. It is the "[i]nvolvement of government officers in the production of testimony with an eye toward trial" that presents the "unique potential for prosecutorial abuse," *Crawford,* 541 U.S. at 56 n. 7, 124 S.Ct. 1354, not whether the exchange can be labeled "formal" or "structured."

¶ 50 Third, whether an interrogation has taken place does not exclude the other formulations of a testimonial statement recognized in *Crawford.* Police questioning and the circumstances surrounding the exchange will obviously effect the declarant. Within the core class of testimonial statements described in *Crawford* were "pretrial statements that declarants would reasonably expect to be used prosecutorially" and "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id.* at 51–52, 124 S.Ct. 1354. Under these formulations, police questioning during a field investigation does not automatically exempt the statements from being testimonial. If, for example, the police have arrested the alleged assailant, have secured the crime scene, and are in the process of obtaining information regarding a crime, a reasonable person may believe or expect the government to use what he or she tells the police in the investigation and prosecution of the assailant. *See, e.g., People v. West,* 355 Ill.App.3d 28, 291 Ill. Dec. 72, 823 N.E.2d 82, 87–88 (2005).

¶ 51 The conclusions we draw from *Crawford* are supported by the approach taken by another panel of this Court as to what constitutes a police interrogation. In *State v. Alvarez,* 210 Ariz. 24, 26, ¶ 3, 107 P.3d 350, 352 (App.2005), a police officer found the victim of a brutal beating staggering down a road. The victim collapsed and began to slip in and out of consciousness. *Id.* The officer questioned the victim about his injuries to obtain medical assistance for him. *Id.* at 30, ¶ 21,

107 P.3d at 356. The officer was able to learn the victim's first name and, before the victim lost consciousness, that three men had jumped him and taken his car. *Id.* at 26, ¶ 3, 107 P.3d at 352. The court found that although the victim had made his statements in response to police questioning, the exchange did not constitute a police interrogation. *Id.* at 29–30, ¶ 21, 107 P.3d at 355–56. Under these circumstances, the questioning was "neither structured nor conducted for the purpose of 'producing evidence in anticipation of a potential criminal prosecution.'" *Id.* at 30, ¶ 21, 107 P.3d at 356 (quoting *Kilday,* 20 Cal.Rptr.3d at 173).

¶ 52 Applying these principles here, we conclude the totality of the circumstances surrounding Cory's statements to Manor at the crime scene demonstrates they were the product of a police interrogation and testimonial under *Crawford.* Before Manor arrived on the scene, the sheriff's deputies already knew Parks had shot and killed Pluguez. Manor was asked by the lead deputy to interview Cory and Harold. Parks had already been arrested; there were no exigent safety, security or medical concerns. Manor's questioning of Cory was not a casual encounter. After Manor had determined Cory and Harold had witnessed the shooting, he separated them. Manor's individual and sequential interview with each one of them reflects Manor was operating in an investigative mode and was attempting to ensure that their recollections would remain their own and have more prosecutorial force. These circumstances demonstrate that at the time Manor began to question Cory, the purpose of his questioning was to obtain information regarding a potential crime. Further, although emotional and upset, Cory appeared to have appreciated that what he had witnessed would have significance to a future criminal prosecution. When the sheriff's deputies arrived at the scene, they heard Cory and his sister yelling their "dad was just defending himself."

¶ 53 We therefore conclude Cory's statements to Manor at the crime scene were testimonial. Their admission at trial violated Parks' constitutionally protected right to confront the witnesses against him.[3]

---

3. The State argues that because Cory was taken
   to the sheriff's department for what it acknowl-

## C. Harmless Error

¶ 54 A confrontation clause violation is subject to harmless error analysis. *Bronson*, 204 Ariz. at 327, ¶ 30, 63 P.3d at 1064. The State, however, has not argued admission of Cory's statements to Manor was harmless, nor, under the facts presented, could it persuasively do so.

¶ 55 At trial, Parks argued he had shot in self-defense. Parks testified that after he had jumped out of the truck, Pluguez still had the compressor in his hands and was advancing toward him, as if to throw the compressor at him. Cory and Harold recalled the incident differently. Cory stated Pluguez had thrown the compressor before his father had jumped out of the truck. Although Harold testified to the same effect, Cory's statement was independently significant because it bolstered and confirmed Harold's testimony regarding the sequence of events. Indeed, in its closing, the State not only emphasized Cory's testimony regarding how the shooting occurred, but further argued Cory's statements were even more credible than Harold's testimony. Under these circumstances, admission of Cory's statements to Manor was not harmless.

## III. Application of Crawford to Cory's Interview with McGuire

¶ 56 Parks also argues admission of Cory's videotaped interview with McGuire violated his right under the Confrontation Clause as interpreted in *Crawford*. Because admission of Cory's statements to Manor violated Parks' confrontation rights, and was not harmless, we need not decide this issue. We note, however, the State concedes the videotaped statement was the product of an interrogation and, thus, testimonial under *Crawford*.

## CONCLUSION

¶ 57 Cory's statements to Manor at the crime scene and his videotaped interview with McGuire were products of police interrogation and testimonial under *Crawford*. The State does not argue Cory's statements to Manor constituted harmless error. Therefore, we reverse Parks' conviction and remand for a new trial. Because we are remanding for a new trial, we need not address the other issues raised by Parks on appeal.

CONCURRING: PATRICK IRVINE and G. MURRAY SNOW, Judges.

---

edges was an interrogation, Manor's questioning of Cory at the crime scene did not constitute an interrogation in the *Crawford* sense. A subsequent, duplicative police interview of a witness does not render a prior police interview of the witness immune from *Crawford*. *See Kilday*, 20 Cal.Rptr.3d at 170 (separate witness statements must be analyzed separately under *Crawford*).